### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### EASTON PACKING COMPANY, Respondent.

### No. 17643.

United States Court of Appeals
Third Circuit.

Argued June 16, 1969.

Decided Sept. 30, 1969.

Jerome Weinstein, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Ian D. Lanoff, Attys., N.L.R.B., on the brief), for petitioner.

George A. Burnstein, Kleinbard, Bell & Brecker, Philadelphia, Pa., for respondent.

Before HASTIE, Chief Judge, and McLAUGHLIN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order directed to Easton Packing Company (Company).

We shall narrate the facts as found by the Examiner and approved by the Board. The Company is engaged in the processing, sale and distribution of quality meat products and related items. The total operation embraces about 20 persons. The Company's president participates in most of its business activities.

In January of 1967, the Company employed in addition to supervisory personnel, 11 persons, consisting of 5 butchers, 2 shippers, 3 truck drivers and 1 maintenance man. One of the butchers, Emil Proch, caused 7 cards (including his own) to be signed by non-supervisory employees authorizing the Union[1] to represent them in negotiations with the Company.

On the morning of January 19, and before work commenced, the Union business agent (Agent) and a Union organizer met briefly with the Company's president and his assistant. The Union representatives stated that they represented certain employees and requested recognition. The president stated that he wanted to consult his attorney. It was agreed that they would meet later that morning. During this time the 7 employees remained outside the plant.

Later on the morning of the 19th, the Agent and employee Proch met with the president and his attorney. At this meeting the Agent referred to the 7 employees gathered outside the plant and stated that the Union had authorization cards from them and therefore requested recognition as bargaining agent for the production and maintenance employees. There was a total of 8 employees in these departments. The attorney asked to inspect the cards and the business agent told him that if the Company examined them, it would amount to a card check for recognition and was equivalent to an election. The attorney proceeded to examine the signatures on the 7 cards and checked them with the president. After this the president asked: "Aren't we supposed to have an election?" The Agent replied that the Company had its election by agreeing to the card check and examining the signatures. The attorney stated that the card check was "coercion."

The individuals nevertheless proceeded to discuss the terms on which recognition might be accorded. The Agent tendered a "letter of recognition" for the Company's approval. It recited that the employer agrees to recognize the Union as the sole bargaining agent for its employees and to negotiate an agreement covering wages, etc. within thirty days. It also contained a provision that "the Employer agrees to employ and retain in its employ only members of the Union in good standing." The president and the attorney questioned whether the quoted provision required an illegal closed shop. The Agent assured them that it was not so intended and that as to new employees the Company would have the benefit of the 30 days probationary period in accordance with the Union's standard collective bargaining agreement. The Agent indicated that the form was presented solely for the purpose of establishing in writing that the Union would be the exclusive bargaining agent. The president nevertheless refused to sign on the advice of his attorney that to do so would make the Company a party to an illegal closed shop agreement. The meeting ended and the attorney said he would be in touch with the Agent within a half hour.

The Agent was not contacted and, after waiting an hour, he established a picket

[1]. Local 195, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

line composed of the seven employees who had signed authorization cards. Two of the seven abandoned the picket line and returned to work on January 23, four days after the commencement of the strike.

On January 26, at the Agent's request, a meeting was held between him and the president. The president said he was "not ready for a union now." He raised no question as to majority status, appropriateness of the unit or union security. A second meeting was held between them on February 2, 1967, again at the Agent's insistence. The president said at the end of the conversation that he would have to think about the matter. Again no question was raised concerning the appropriate unit, etc. No contacts occurred thereafter.

During the first three weeks of the strike, but after January 23, Company officials contacted three of the seven striking employees regarding an early end to the strike. The president phoned one meatcutter and promised to give him anything he wanted to secure his return to work. Later a Company foreman told the same employee that the president would give him Blue Cross and Blue Shield if he would return to work.

A few days subsequent to the events described above, the president phoned another meatcutter and asked to meet with him. At the meeting the president asked him to return to work. The employee said he would return only if the Company signed a two year commitment, providing Blue Cross and Blue Shield, and an hourly wage increase of $3. Thereafter the Company foreman called this employee and said that if the striking employees would come back to work, they would be given Blue Cross and Blue Shield, would be paid for time lost due to the strike, and would get a raise.

On February 14, 1967, the Union filed its original unfair labor practices charge with the Board. On February 21, 1967, the Union sent the Company a telegram making it clear that no closed shop provision was sought.

The strike continued until March 6, when the remaining pickets other than Proch returned to work.

Based on the foregoing facts, the Board found that on January 19, 1967, the Union represented a majority of the employees in an appropriate unit, and that the Company violated section 8(a) (5) of the Act by refusing on and after January 19 to bargain with the Union as the exclusive representative of its employees. The Board also found that the Company violated section 8(a) (1) of the Act by promising employees benefits if they abandoned the strike and returned to work.

The Board's order, *inter alia*, requires the Company to cease and desist from the unfair labor practices found and from the coercion of its employees in the exercise of their statutory rights. It also requires the Company to bargain with the Union upon request. In addition it requires the Company to place employee Proch on a preferential hiring list.

The Board decided this case before the decision of the United State Supreme Court in NLRB v. Gissel, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Board determined that the Company did not have a good faith doubt of the Union's majority status when it was presented with unchallenged authorization cards representing a majority of the employees in the claimed bargaining unit.

The Supreme Court said in Gissel, however, that the employer's good faith doubt is "largely irrelevant" where the Company's refusal to extend recognition to the Union is accompanied by unfair labor practices. Rather, where there are unfair labor practices, such as the Board here found and the Company does not challenge, the test is whether the practices are likely to undermine the Union's majority and impede an election.

■ Because of the approach taken by the Supreme Court, we must remand this matter to allow the Board to determine in its discretion whether the

Company's 8(a) (1) unfair labor practices are of the character which call for a bargaining order as an appropriate remedy. Since there is to be a remand, the ·Board is also free to consider the effect of any contention that the Company knew, apart from the authorization cards, that a majority of the employees supported the Union. See Gissel, supra, at 591 and 594.

We need not consider the Company's contentions that it was under no duty to bargain on January 19, because the Union sought an illegal closed shop and an inappropriate bargaining unit. Even if the Company were correct, the unfair labor practices could still, under Gissel, justify the entry of a bargaining order by the Board.

The Company also contends that it had no duty to bargain because the Union lost its majority status when two striking employees returned to work on January 23, prior to the unfair labor practices. The record before us contains no findings as to the Union's majority status after January 23. On remand the Company is free to advance this issue for such consideration as the Board deems appropriate.

Finally, we consider the Company's contention that the portion of the Board's order directing that Emil Proch be placed on a preferential hiring list is manifestly improper. Although the Board determined that the Company's failure to rehire Proch was nondiscriminatory, this finding does not vitiate Proch's rights as an employee participating in an unfair labor practice strike. We conclude that the portion of the Board's order relating to Proch is proper.

The portions of the Board's order directing the Company to cease and desist from the unfair labor practices and to place Emil Proch on a preferential hiring list will be enforced. The bargaining provision of the order will be remanded to the Board for further consideration in conformity with this opinion.