**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**EASTON PACKING COMPANY, Respondent.**

**No. 18713.**

United States Court of Appeals, Third Circuit.

Argued Sept. 24, 1970.

Decided Jan. 15, 1971.

Avrum Goldberg, National Labor Relations Board, Washington, D. C. (Arnold

Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Ian D. Lanoff, Attys., N.L.R.B., on the brief) for petitioner.

George A. Burnstein, Kleinbard, Bell & Brecker, Philadelphia, Pa., for respondent.

Before KALODNER, FREEDMAN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

KALODNER, Circuit Judge:

Does an employee's return to work in disregard of a strike called by his Union[1] evidence his withdrawal from the Union and his repudiation of it as his bargaining representative?

That is the critical issue presented by the instant petition[2] of the National Labor Relations Board ("Board")for enforcement of its Supplemental Decision and Order issued against Easton Packing Company ("Company") on February 4, 1970[3] reaffirming the bargaining provision of its original order issued against Company on June 20, 1968.[4] In its initial Decision and Order, the Board found that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, by refusing to bargain with the Union as the exclusive representative of its employees after being presented with authorization cards signed by a majority of the employees in an appropriate unit. The Board further found that the Company violated Section 8(a) (1) of the Act by promising benefits to several employees if they abandoned a strike called by the Union and returned to work.

The Board's initial Order, *inter alia,* directed the Company (1) to cease and desist from the unfair labor practices found and from the coercion of its em-

---

1. Local 195, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO.

2. The Board's petition is pursuant to the provisions of § 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e).

3. 180 NLRB No. 175 (S.A. 16).

4. 171 NLRB No. 183.

ployees in the exercise of their statutory rights; (2) to place a former employee named Proch on a preferential hiring list; and (3) to bargain collectively with the Union upon its request.

Upon the Board's petition for enforcement of the initial Order, we enforced it at 416 F.2d 256 (1969) insofar as it directed the Company to cease and desist from the unfair labor practices found by the Board and to place Proch on a preferential hiring list. We, however, remanded the bargaining provision of the Order to the Board for further consideration in light of NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We did so because the bargaining provision had been premised on the Board's finding that the Company did not have a good faith doubt of the Union's majority status when it was presented with unchallenged authorization cards signed by a majority of the employees in the bargaining unit, and in *Gissel* the Court had noted:

> "Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election." 395 U.S. at 594, 89 S.Ct. at 1930.

The Board, upon the remand, after consideration of statements of position filed by its General Counsel and the Company, and the record with respect thereto, withdrew its earlier finding which predicated the Company's violation of Section 8(a) (5) on the absence of a good faith doubt of the Union's majority status. It found "that by refusing to bargain with the Union and by engaging in a series of unfair labor practices which were calculated and tended to undermine the Union's majority status, the Respondent [Company] violated Section 8(a) (5) and (1)," and "[u]nder these circumstances, * * * we find that the purposes of the Act can

better be effectuated and employee rights better protected by reliance on the employees' desires as expressed by their signed authorization cards than on the results of an election." On the basis of these findings the Board determined that the initial bargaining was appropriate to remedy the Company's violations of Section 8(a) (5) and the other unfair labor practices found.

Relevant to our disposition here are these undisputed facts:[5]

The Company is engaged in the processing, sale and distribution of quality meat products and related items. In January 1967, it employed eleven persons in its production and maintenance department, including five butchers, two shippers, three truckdrivers and one maintenance man.

On the morning of January 19, 1967 the Union's representatives presented to the Company cards signed by the five butchers and the two shipping employees which authorized the Union to represent them in negotiations with the Company. The Company examined the authorization cards and raised no objection to their validity or to the appropriateness of the proposed bargaining unit. The Union requested recognition as bargaining agent for the production and maintenance employees, and tendered a "letter of recognition" which the Company refused to sign and said it would contact the Union a half hour later. It failed to do so and the Union shortly thereafter called a strike and formed a picket line of the seven employees who had signed the cards. On January 23—four days after the strike began—two of the seven employees abandoned the picket line and returned to work. Thereafter during the first three weeks of the strike, the Company contacted three of the picketing employees and offered them inducements to return to work.

The Company advised the Union that it was not ready to extend recognition to it in the course of two meetings during

---

5. A more detailed statement of the facts is made in our prior opinion at 416 F.2d 257.

the first two weeks of the strike, which, it may be noted parenthetically, ended on March 6, 1967 when all but one of the five picketing strikers returned to work.

The substance of the Company's contentions in the instant enforcement proceedings is that when two of the seven striking employees abandoned the picket line on January 23, 1967 and returned to work, the Union lost its majority status, and since the Company had not at that time committed any unfair labor practice there was no valid basis for the Board's bargaining order which was premised on subsequent unfair labor practices, viz., offering inducements to striking employees after January 23.

The stated contentions present the critical earlier-stated question as to whether an employee's return to work in disregard of a strike called by his Union evidences his withdrawal from the Union and repudiation of the Union as his bargaining representative.

That question must be answered in the negative.

■ The record establishes that the two employees who abandoned the strike and returned to work did not seek the return of their authorization cards nor did they indicate to the Union or the Company that they no longer sought union representation. In these circumstances the abandonment cannot be construed as an implied withdrawal of their union authorization. Palmer Asbestos & Rubber Co., 160 NLRB 723, at page 730 (1966).

We recently held that there is no presumption that an employee's return to work during a strike demonstrates his rejection of his union as his bargaining representative, and accordingly his employer could not rationally assume that the returning striker had abandoned his

union. NLRB v. Frick Company, 423 F.2d 1327, 1333–1334 (1970).[6]

Our holding that the return of the two striking employees did not evidence their repudiation of the Union as their bargaining representative disposes of the Company's contention that the Union had lost its majority bargaining representative status, making irrelevant the Company's unfair labor practices, viz., inducements to other striking employees to return to work.

■ That being so we are only required to decide whether the Board's instant bargaining order transgressed the permissible limit of its remedial powers.

The scope of judicial review of Board orders was succinctly spelled out in *Gissel* as follows:

"It is for the Board and not the courts, however, to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c) ), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)." 395 U.S. at 612, n. 32, 89 S.Ct. at 1939.

Here the Board, in its Supplemental Decision and Order, premised its bargaining order on its explicit determination that the Company's refusal to bargain and its unfair labor practices "were calculated and tended to undermine the Union's majority status" and that "the unfair labor practices were of such nature as to render it doubtful that the coercive effects of Respondent's unfair labor practices could be eliminated by

---

6. In *Frick*, we cited the holding in West Fork Cut Glass Co., 90 NLRB 944, 956–957 (1950), enforced in relevant part, NLRB v. Borchert, 188 F.2d 474 (4 Cir. 1951), that a striking union employee's return to work may have been nothing more than "a vote of no confidence in the strike action, and not necessarily a repudiation of the Union in its representative capacity."

traditional remedies, so as to insure a fair election."

On review of the record we certainly cannot say that the Board's bargaining order transgressed its broad discretionary remedial powers.

For the reasons stated the Board's Order will be enforced.