## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## BLACKSTONE COMPANY, INC., Respondent.

### No. 81–3132.

United States Court of Appeals, Third Circuit.

Argued July 26, 1982.

Decided Aug. 11, 1982.

William A. Lubbers, Gen. Counsel, John D. Burgoyne (argued), Asst. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Jolane A. Findley, Atty., N. L. R. B., Washington, D. C., for petitioner.

Theodore M. Eisenberg (argued), Joseph P. Paranac, Grotta, Glassman & Hoffman, P. A., Roseland, N. J., for respondent.

Before GIBBONS and HUNTER, Circuit Judges and LORD *, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This petition for enforcement of an NLRB cease and desist and reinstatement order arises out of the NLRB's findings of violations of sections 8(a)(1) and (a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3) (1976) (the Act), by the Blackstone Company, Inc. (the Company). Because we believe the administrative law judge applied the wrong burden of proof to the Company in its attempt to rebut the General Counsel's *prima facie* case of violations of section 8(a)(3) in the discharge of two employees, we remand to the Board for further proceedings on those charges. In all other respects we enforce the Board's order.

### I.

The Company, which manufactures and distributes wooden windows, doors and related products for use in the construction industry, employs approximately forty persons as production workers, warehousemen and drivers. In May 1978, the Teamsters Local Union No. 35 (the Union) began an organizing campaign at the Company's East Brunswick plant with meetings among Union officials and small numbers of employees at local restaurants and private homes. Early in September 1978 the Union stepped up its efforts with an organizing meeting held at a local McDonald's restaurant, which was attended by a number of drivers. During the meeting, several employees signed Union authorization cards and shortly after the meeting, an in-plant organizing committee was formed to distribute literature and cards on behalf of the Union. On September 28, 1978 the Union filed a representation petition, and on November 21, 1978 the election was held. The Union lost the election,[1] and on December 6, 1978 and February 29, 1979 it filed complaints with the Regional Office of the NLRB. It alleged that the Company committed various unfair labor practices during the pre-election period pending resolution of the election objections, and that the Company discharged two employees, Robert Nagy and Kevin Moffat. After an investigation, the General Counsel issued a complaint charging that the Company violated section 8(a)(1) of the Act by promising employees benefits, interrogating and threatening them and creating the impression of surveillance, and violated sections 8(a)(1) and (a)(3) of the Act by its discharge of the two employees. After a hearing on January 30, 31 and February 1 and 4, 1980, an administrative law judge (ALJ) found that the Company had violated sections 8(a)(1) and (a)(3), entered a cease and

---

* Hon. Joseph S. Lord, III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Eighteen employees voted for representation and 18 voted against. There were two challenged ballots. An administrative ruling on the challenged ballots resulted in a revised vote of 18 for representation, and 19 against. Neither the representation petition nor the objections are before the court on this petition for enforcement.

desist order, and ordered reinstatement of Nagy and Moffat. 32a–33a. The Company filed objections to the ALJ's findings, 36a, but the NLRB affirmed the findings and order of the ALJ and ordered that a second election be held. 43a. On December 31, 1981 the NLRB filed its petition for enforcement.

## II.

### The 8(a)(1) Violations

■ We are bound to affirm the administrative factual findings and inferences drawn from the facts when they are supported by substantial evidence contained in the record as a whole. *E.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 164 n.6 (3d Cir. 1977); *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 243 (3d Cir. 1976). This standard of review requires deference to the ALJ's interpretation of what can be characterized as fairly conflicting accounts of events presented on the record. *E.g., NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962).

The findings of violations of section 8(a)(1)[2] need not detain us at great length. To establish a violation of section 8(a)(1), the NLRB must show that "under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *NLRB v. Armcor Industries, Inc.*, 535 F.2d at 242, (*quoting, Local 542, International Union of Operating Engineers v. NLRB,* 328 F.2d 850, 852–53 (3d Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964)).

■ Numerous employees testified that Company Vice President Stanley Swerdlick questioned them as to their Union support, indicated to them that he knew which employees had signed Union authorization cards or otherwise favored the Union, and, in some cases, threatened them with loss of employment if the Union succeeded. The ALJ concluded that these activities created the impression of surveillance, and constituted unlawful interrogation and threats of economic reprisals. One employee testified that he requested a pay raise, and that Swerdlick promised to take care of him when the Union matter was resolved. The ALJ found that Swerdlick intended to convey the impression that the sole reason for refusing to consider the employee's request immediately was the Union activity. The ALJ further found that the Company violated the Act by making unlawful promises of benefits in the form of additional holidays and a profit sharing plan, in order to discourage Union support.

The Company disputes the findings of the ALJ as to these section 8(a)(1) violations. However, as we stated in *Behring International, Inc. v. NLRB*, 675 F.2d 83 (3d Cir. 1982):

> [W]e might well have come to a different conclusion had we tried the case in the first instance. Our role, however, is limited to determining whether there is substantial evidence in the record as a whole to support the Board's findings of fact. 29 U.S.C. § 160(e) (1976). Similarly, credibility resolutions generally rest with the ALJ when he considers all the relevant factors in his explanation. *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 365 (3d Cir. 1978). Since we cannot say that substantial evidence is lacking here, we must reject the company's challenges to the § 8(a)(1) findings.

*Id.* at 85–86.

## III.

### The 8(a)(3) Violations

We find far more troublesome the Board's finding that the Company violated section 8(a)(3)[3] by discharging Nagy and

---

**2.** Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1976). Section 157 provides in part that "employees shall have the

right to self-organization, to form, join or assist labor organizations . . . and to engage in other concerted activities for . . . other mutual aid or protection." 29 U.S.C. § 157 (1976).

**3.** Section 8(a)(3) makes it an unfair labor prac-

Moffat. Nagy and Moffat were both Union supporters and had signed authorization cards. Because the Company was aware of their Union activity, and because their discharges occurred in the context of numerous section 8(a)(1) violations, the ALJ found that the General Counsel had established a *prima facie* showing that protected conduct was a motivating factor in the Company's decisions to discharge them.

The burden then shifted to the Company to proffer a legitimate non-discriminatory justification for the discharges. In the case of Nagy, the Company asserted that it had fired him because of thefts and various other incidents of misconduct.[4] The Company presented affidavits and testimony of three witnesses who claimed Nagy confessed stealing or that they actually witnessed acts of theft. Nagy denied any such incidents, and thus created a dispute as to the true motive behind Nagy's discharge.

The Company alleged that it terminated Moffat for incompetence. A Company supervisor testified that he had received reports from three of Moffat's co-workers, each stating that Moffat was a poor driver and poor worker. The ALJ specifically credited the report from one of the co-workers that Moffat used excessive speed and would not make a satisfactory driver or loader. 29a. Thus, there was conflicting evidence as to the reason for Moffat's discharge.

In *Behring International, Inc. v. NLRB,* we outlined the burdens of coming forward and of proof in such a case:

Under our formula, once the General Counsel has established a *prima facie* case of discriminatory discharge, the employer should rebut this with evidence of a legitimate business reason for its action. The ultimate burden of proof does not shift from the General Counsel and does not

devolve upon the employer at any stage. Therefore, no violation may be found unless the Board determines that the General Counsel has proved by a preponderance of the evidence that the employer's anti-union animus was the real cause of the discharge.

*Id.* at 90. In adopting the above formulation we rejected that of the NLRB in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), which shifts the burden of persuasion on the issue of motive to the employer once the General Counsel establishes a *prima facie* case of discriminatory discharge.

▆ According to the NLRB, this is not a case of dual motive, but instead presents the issue whether substantial evidence supports the ALJ's finding that the Company's asserted justifications for the discharges were not credible. Brief at 28. Although the ALJ did ultimately reject the legitimate reasons advanced for the discharges, the ALJ imposed on the Company the task of establishing lack of impermissible motive and thus misallocated the burdens of proof. The ALJ repeatedly stated that the Company had failed to establish its asserted defenses to the two discharges. Rejecting the Company's justification for its discharge of Nagy, the ALJ concluded:

It is my opinion that on this record Respondent has failed to support its defense that Nagy was a thief or that it was reasonable to have such a belief. The defense rests exclusively on the alleged admissions made by Nagy to Voloysn, Prell and Barkaszi, admissions which Nagy denied. There is no independent evidence supporting the various allegations, and indeed there is no convincing evidence that anything was stolen, let alone by Nagy. . . . Respondent made no effort to demonstrate that such items

---

tice for an employer to "encourage or discourage membership in any labor organization" by "discrimination in regard to hire or tenure of employment or any term or condition of employment . . . ." 29 U.S.C. § 158(a)(3) (1976).

4. These incidents included (1) assisting other employees in thefts; (2) submitting false gaso-

line receipts; (3) offering to exchange marijuana for false gasoline receipts from a gas station attendant; (4) threatening to pound Shipping Manager William Bostic's head in the snow; (5) planning to have Bostic's legs broken; (6) smoking marijuana while on duty. Nagy denied all six allegations. 19a.

actually were removed without authorization, either from its plant or from customers. . . . With respect to the case of the stolen drop light there is no evidence that such a light was stolen or that such a light even existed, again apart from Nagy's alleged admission. . . . [A]lthough [the Company] claimed to have received a $13.94 bill from the contractor for the light and to have paid it, no convincing records were introduced to establish these facts. And finally the failure to call the contractor, or to explain such failure, to establish the fact of a stolen light and the report thereof to Respondent, under all the circumstances, is a serious weakness in Respondent's case.

24a. Similarly, in Moffat's case, the ALJ imposed upon the Company the burden of proving its innocence of impermissible motive. For example, the ALJ stated:

> Although, Respondent has shown that it had a practice of discharging employees for poor performance, I conclude that it has not sustained its burden of establishing that Moffat fell within that group of poor workers so that he would have been fired in the absence of his having engaged in protected activity.

29a. Because the hearing in this case was held prior to our opinion in *Behring International,* and because the ALJ explicitly relied on the *Wright Line* test in allocating the respective burdens of proof, 20a, this case must be remanded to the NLRB for reconsideration.[5]

5. During oral argument, Board counsel took the position that the Board and administrative law judges would continue to follow Board decisions, and not Third Circuit law:

> MR. BURGOYNE: The record, I think—although it possibly is a teeny bit ambiguous, your Honor—I can't dispute that the Administrative Law Judge applied, because he was bound to apply, the Board's *Wright Line* decision.
>
> The Board has instructed its Administrative Law Judges that they are bound by the Board's decisions here.
>
> This court has told us—and we have disagreed with the court on this—this court believes that we are required at least in cases arising within the area of the Third Circuit that [we'll] apply Third Circuit law; and, of

IV.

The NLRB's Order reinstating Kevin Moffat and Robert Nagy and awarding them back pay and lost seniority will be vacated and the case remanded for further proceedings. In all other respects, the order will be enforced. Each party will bear its own costs.

course, this court is aware that the Board—that is not the Board's position.

Counsel in fact stated that the Board was different from other litigants in the circuit:

> MR. BURGOYNE: We feel that we are different in the sense that we are—we are an agency of the federal government.

The Board will not be treated differently from any other litigant. Whether or not the Board agrees with the holdings of this court, it is bound to follow them. *See Allegheny General Hospital v. NLRB,* 608 F.2d 965, 970 (3d Cir. 1979). We consider the Board's contrary instructions to its administrative law judges to be completely improper and reflective of a bureaucratic arrogance which will not be tolerated.