**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARMCOR INDUSTRIES, INC., Respondent.**

**No. 75–1713.**

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1976.

Decided May 3, 1976.

Robert A. Giannasi, Asst. Gen. Counsel, Michael F. Messitte, Atty., N. L. R. B., Washington, D. C., for petitioner.

Hayes C. Stover, Peter H. Beaman, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for respondent.

Before GIBBONS, FORMAN and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The scenario of this proceeding has been played frequently on the industrial scene. The case and stage differ, but the theme revolves around the efforts of the officers of a small manufacturing company to cope with a sudden union organizing movement at its plant.

The first and least difficult issue presented is whether there is substantial evidence to support the Board's finding that respondent, Armcor Industries, Inc., ("the Company" or "Armcor"), had engaged is unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3) (1970). We conclude there is and grant the Board's petition for enforcement

of that part of its order[1] requiring the Company to cease and desist from the unfair labor practices and to reinstate two unlawfully discharged employees. The Board, in exercise of its remedial authority sustained by the Supreme Court in *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), also ordered the Company to recognize and bargain with United Electrical Radio and Machine Workers of America ("UE") as the exclusive bargaining representative of Armcor's production and maintenance employees. That part of its order is remanded for further proceedings consistent with this opinion.

■ Following a discussion among some of the Company employees of the need for union representation in the plant, employee Michael Rossi contacted UE representative Ron Baldasseroni and the two arranged for a meeting to be held for interested employees on the evening of May 28.[2] Apparently, word of the initial meeting promptly reached management officials because on the afternoon of the twenty-eighth, Company Vice-President Jack Fabean asked two employees where the meeting was going to be held that evening and told one that anyone who wanted a union was crazy and that employee problems should be brought to management for resolution.[3] The meeting was attended by 15 of Armcor's 23 employees; all 15 signed authorization cards. The next day Rossi solicited and secured signed authorization cards from four additional employees.

On the morning of May 30, Fabean asked Rossi whether "he got all the cards back" and further inquired "how many." Fabean commented that if problems were brought to management, employees would have been given what they wanted. That same morning, some employees were discussing the Union in the lunchroom when Fabean came in and remarked that he could hear everything they were saying because "the walls are paper thin."

At lunchtime on May 30, Charles Copeland, a representative of the International Union of Electrical Workers, AFL–CIO ("IUE") and friend of Armcor President Pat DeLaquil, suddenly appeared on the scene and approached a group of employees who were eating their lunch outside the plant. Copeland went up to Rossi saying, "you must be Mike." He said that he was "from the IUE and that somebody in the office had called [him] and told [him] that you were in need of a union here." Rossi informed Copeland that the employees wanted the UE.[4]

At the end of work that same day, Thursday, Rossi and fellow employee Wayne Burns were called into the office of plant

---

1. The Board's decision is reported at 217 N.L.R.B. No. 59 (1975).

2. The events detailed herein occurred in 1974.

3. Whether Fabean made these statements has been hotly contested. Testimony by Fabean and two disinterested witnesses placed Fabean at a 45 minute drive from the plant for most of the day of the twenty-eighth. The Administrative Law Judge ("ALJ") concluded that Fabean had an opportunity to approach the employees at some time in the day.

Armcor's brief takes pains to point out other instances in the record where the ALJ resolved conflicts by crediting employee witnesses rather than Armcor officials.

The Company recognizes, as it must, that the final determination of credibility rests with the ALJ as long as he considers all relevant factors and sufficiently explains his credibility resolutions. *Altemose Construction Co. v. N.L.R.B.*, 514 F.2d 8, 16 (3d Cir. 1975); *N.L.R.B. v. Wings & Wheels, Inc.*, 324 F.2d 495, 496 (3d Cir. 1963). Where an explanation, however, is clearly insufficient, this court may question the ALJ's judgment. *See N.L.R.B. v. Northern Metal Co.*, 440 F.2d 881, 886 (3d Cir. 1971).

We need not consider the adequacy of the ALJ's resolution of this particular testimonial conflict between Fabean and the two employees. Given the other evidence in the record, this one incident is immaterial. Other testimonial conflicts did not involve third-party evidence and were resolved solely on credibility determinations. We see no cause to disturb the ALJ's findings. Hereinafter, the facts described are as found by the Board.

4. Armcor has one plant, at Murrysville, Pennsylvania, where it fabricates and assembles windows for non-retail sale and distribution. The Company has been in operation only since 1973 and, at the time of these events, none of the employees had ever been represented by a union.

manager Kyle. Kyle gave them their checks and told them they were being laid off because of *lack of work* and because they were the least senior male employees. Kyle also told them that they either were unable to or would not perform work other than their normal job of final window assembly. Neither replied to Kyle, but took their checks and departed.

On the very next day, May 31, UE organizer Baldasseroni, accompanied by a group of employees, approached Company President DeLaquil and requested recognition of the UE as the employees' bargaining representative. DeLaquil refused, and later told a group of employees that he did not want Baldasseroni on Company property again.

That afternoon DeLaquil spoke to employee Elaine Seiler at her work station and inquired why she wanted a union. When she replied for "job security and higher pay," DeLaquil said, there is "no way [employees] could get higher pay—the doors would have to close first." DeLaquil also said he was disappointed that employees did not bring problems to him first. Later that afternoon, DeLaquil asked another employee why he wanted a union, and again expressed disappointment that problems were not brought to him first.

That evening, the Company held one of its regularly scheduled "Pizza Nights" where, after work, employees were provided with dinner and were given an opportunity to express their grievances. DeLaquil briefly addressed the employees telling them that he was aware of their attempt to organize a union, that he did not particularly oppose such activity, but that he did not like the UE and "would fight it all the way." He further told them that the UE was no longer affiliated with the AFL–CIO, that in its early days the UE had been affiliated with the communist party, that a

local UE organized plant had experienced a long strike and several wildcat strikes, and that he preferred that the employees' union be affiliated with the AFL–CIO. Also during this speech DeLaquil said he had been thinking about and preparing a profit-sharing plan, but that it could not be put into effect if they brought in the UE.[5]

## I. *The Section 8(a)(1) Violation*

The Board found that the Company violated Section 8(a)(1) of the Act by coercively interrogating employees concerning their union sympathies and activities; by threatening employees with economic reprisals, including closing of the plant if the Union came in and demanded higher wages; by creating the impression of surveillance; by encouraging union activity among its employees on behalf of a rival labor organization; and by promising employees benefits if they refrained from engaging in union activities.

█ To establish a violation of Section 8(a)(1), it need only be shown that "under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *Local 542, International Union of Operating Engineers v. N.L.R.B.*, 328 F.2d 850, 852–3 (3d Cir. 1964), *cert. denied*, 379 U.S. 826, 85 S.Ct. 161, 13 L.E.2d 93 (1964). *See N.L.R.B. v. Burnup & Sims, Inc.*, 379 U.S. 21, 23–4, 85 S.Ct. 171, 172–73, 13 L.Ed.2d 1, 3–4 (1964). Whether an employer's actions meet that test is a question of fact for the Board and its determinations are conclusive if supported by substantial evidence. *See Mon River Towing, Inc. v. N.L.R.B.*, 421 F.2d 1, 9–10 (3d Cir. 1969).

█ Considering the record as a whole, we conclude that the Board's order with respect to the Section 8 (a) (1) violations is

---

5. It is not disputed that this speech was the first mention to the employees of the profit-sharing plan. It is disputed, however, whether DeLaquil referred specifically to the UE, or to any union. The ALJ's finding is supported only by an indication that he credited the testimony of one employee. DeLaquil and two other employees testified that the reference was to any union. The ALJ's explanation of his finding here is inadequate, but it matters little which version is correct. Even if the reference was to any union, the ALJ may reasonably have inferred that the employees would take the statement as a veiled threat against UE membership.

supported by substantial evidence and will be enforced. *See, e. g., N.L.R.B. v. Colonial Knitting Corp.,* 464 F.2d 949, 951 (3d Cir. 1972) (employer questioned employee about signing union cards without assurance of reprisal); *N.L.R.B. v. Clapper's Mfg. Co., Inc.,* 458 F.2d 414 (3d Cir. 1972); *Mon River Towing, Inc. v. N.L.R.B.,* 421 F.2d 1, 9 (3d Cir. 1969) (implied threat of reprisal sufficient).

## II.   *The Discharge of Rossi and Burns*

The Board further found that the Company violated Sections 8(a)(3) and (1) of the Act by discharging Rossi and Burns. With respect to Rossi, the Board argues that he was the prime instigator of the UE movement at the plant, that this became known to Company officers just prior to their terminating him, and that the abruptness and mid-week timing of the discharge, in the context of the other unfair labor practices, indicate the Company's anti-union motivation underlying the discharge. With respect to Burns, the Board admits that his union activity was minimal,[6] but contends that the Company discharged him to give an aura of legitimacy to Rossi's discharge.[7]

■ The critical element in employee discharge cases is the intent of the employer to discourage union activity. *N.L.R.B. v. Brown,* 380 U.S. 278, 286–7, 85 S.Ct. 980, 985, 13 L.Ed.2d 839, 846 (1965). When the record establishes a prima facie case that "the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the bur-

den is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." *N.L.R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027, 1035 (1967).

■ The Company sought to justify the discharges on the ground that a reduction in work force was necessary because of lack of available work, and Rossi and Burns were chosen for "indefinite layoff" because they were the least senior male employees, they had poor work records, and they either could not perform jobs other than window assembling, or did so only with complaining. The factual basis for each of these points is disputed by the parties, but we do not propose to examine those arguments in detail here. The linchpin of the Company's argument, as we understand it, is that the work force had to be reduced. While there is evidence in the record that indicates that a major contract was being completed at the time of the discharges, the record also reveals that the Company began hiring within 10 days after the discharges, and within 90 days had hired 21 new employees. That fact has never been adequately explained. In view of these facts and other evidence in the record, we find no basis for disturbing the Board's decision on the discharges.

## III.   *The Bargaining Order*

Of equal importance, but requiring more complex considerations, is the determination of what is the appropriate remedy in

**6.** Burns had attended the May 28 Union meeting and had there signed a union authorization card.

**7.** In making this finding the Board rejected the ALJ's determination that Burns' discharge was not unlawful. The ALJ found that Burns' work record was "dismal" and that he had been admonished about it prior to any union activity. The ALJ analyzed previous Board decisions on the "discharge to lend appearance of legitimacy theory" to require that the employees be "so linked together in terms of a fraternal as well as a job relationship as to be considered one," and had not found sufficient evidence here to meet this standard. The Board rejected his theory as too restrictive: "All that

is required is a finding that the discharge of one was undertaken in the attempt to validate or vindicate the discharge of the other." Other courts have approved this theory as the basis of a Section 8(a)(3) violation and we do so too. *See N.L.R.B. v. Dorn's Transportation Company,* 405 F.2d 706, 713 (2d Cir. 1969); *Steves Sash & Door Company v. N.L.R.B.,* 401 F.2d 676, 681 (5th Cir. 1968); *N.L.R.B. v. Ambrose Distributing Co.,* 358 F.2d 319, 321 (9th Cir.), *cert. denied,* 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966); *Wonder State Manufacturing Company v. N.L.R.B.,* 331 F.2d 737, 738 (6th Cir. 1964); *N.L.R.B. v. Williams,* 195 F.2d 669, 672 (4th Cir.), *cert. denied,* 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952).

light of these unfair labor practices. The Board concluded that "the only appropriate remedy" was a summary order directing the Company to recognize and bargain with the UE as the exclusive bargaining representative of the employees at the plant solely on the basis of the union authorization cards.

The Board's authority to issue such bargaining orders was expressly sustained by the Supreme Court in *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). It is by now a familiar refrain that the *Gissel* Court posited a tripartite categorization of unfair labor practices for considering the issuance of bargaining orders without requiring elections. First, in "exceptional cases" marked by "outrageous" and "pervasive" unfair labor practices which eliminate the possibility of holding a fair election, a bargaining order may issue even without a showing that the union at one point had a card majority. *Id.* at 613–4, 89 S.Ct. at 1939–40, 23 L.Ed.2d at 577–78. Second, in "less extraordinary cases marked by less pervasive practices," where there is a showing that the union at one point had a card majority, the Board may issue a bargaining order when it concludes that the extensiveness of the employer's unfair labor practices "have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940, 23 L.Ed.2d at 578. Finally, when the unfair labor practices are minor and less extensive and have only a minimal impact on the election process, no bargaining order may issue. *Id.* at 615, 89 S.Ct. at 1940, 23 L.Ed.2d at 578.

■ In issuing bargaining orders pursuant to *Gissel,* the Board has not always articulated which of the above categories it was applying. Reviewing courts have suggested, urged, and sometimes directed that the Board clearly explicate its reasons for issuing a bargaining order and include findings as to why a fair election cannot be held. *Peerless of America, Inc. v. N.L.R.B.,* 484 F.2d 1108, 1118 (7th Cir. 1973); *N.L.R.B. v. Kaiser Agr. Chem. Div. of Kaiser A. & C. Corp.,* 473 F.2d 374, 383 (5th Cir. 1973); *N.L.R.B. v. World Carpets of New York, Inc.,* 463 F.2d 57, 62 n. 6 (2d Cir. 1972); *General Steel Products, Inc. v. N.L.R.B.,* 445 F.2d 1350, 1354–5 (4th Cir. 1971). *Gissel* itself contemplates that the Board "must make 'specific findings' as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make 'a detailed analysis' assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring misconduct, and the potential effectiveness of ordinary remedies." *Peerless of America, Inc. v. N.L.R.B.,* 484 F.2d at 1118. *See N.L.R.B. v. Gissel Packing Co.,* 395 U.S. at 615–16, 89 S.Ct. at 1940–41, 23 L.Ed.2d at 578–579. In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under *Gissel* is salutary. For the reasons set forth hereinafter, we adopt it.[8]

The Board's opinion in the instant matter does not clearly state under which of the *Gissel* categories it issued the bargaining order. The Board characterized the Company's acts as "extensive and egregious" and "designed to interrupt, thwart, destroy the employees' support of the union, and make the holding of a fair election impossible." However, it also relied on the presence of a card majority, which is relevant only to the second category. The Board's brief seeks to justify the order under either of the first two *Gissel* categories.

**8.** This court has affirmed bargaining orders without explicitly requiring the Board to support its decision with a statement of findings and conclusions. *See N.L.R.B. v. Juniata Packing Company,* 464 F.2d 153 (3d Cir. 1972); *N.L.R.B. v. Colonial Knitting Corp.,* 464 F.2d 949, 952 (3d Cir. 1972); *N.L.R.B. v. Easton Packing Co.,* 437 F.2d 811 (3d Cir. 1971). The opinions in those cases do not indicate whether the Board decisions contained sufficient supporting statements, nor do the opinions indicate that the lack of such statements was raised as an issue. Thus, it appears that the court has not considered the question we address here.

The issuance of bargaining orders was approved in *Gissel* only under those circumstances where an employer's unfair labor practices so undermine the electoral process that a fair election is precluded. We have considerable doubt whether the unfair labor practices in this case have sufficiently detracted from the integrity of the electoral process to warrant the use of a bargaining order. The implied surveillance, vague promises of benefits and veiled threats are not certain to disrupt a fair election conducted under the rules of the Board. Even the discharge of Rossi and Burns need not necessarily have intimidated other employees; there was evidence that both had poor work records and the other employees may well have perceived that they were discharged for that reason.[9]

■ We recognize that it is not our function to substitute our judgment for the Board's on the propriety of a bargaining order.

It is for the Board and not the courts . . . to make that determination, based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act . . . the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.

*N.L.R.B. v. Gissel Packing Co.,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939, 23 L.Ed.2d at 577. However, we do have a reviewing function to perform and deference to the Board's expertise does not require abdication of that function. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Requiring the Board to state its reasons enables the reviewing court to "guarantee the integrity of the administrative process." *Atchison, T. & S. F. R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350, 361 (1973). It also contributes to the growth and predictability of this important area of labor law. In addition, the "requirement that the Board provide analysis and findings serves as a prophylaxsis against an arbitrary exercise of the Board's power." *Walgreen Co. v. N.L.R.B.,* 509 F.2d 1014, 1018 (7th Cir. 1975). *Cf. N.L.R.B. v. Kaiser Agr. Chem. Div.,* 473 F.2d 374, 383 (5th Cir. 1973); *N.L.R.B. v. General Stencils, Inc.,* 438 F.2d 894, 904 (2d Cir. 1971). The Board therefore must make "specific findings" as to the impact of the unfair labor practices on the election process and clearly explicate the basis for its decision to issue a bargaining order.

What we ask of the Board should not be a great burden, nor should our requirement limit the issuance of bargaining orders whenever necessary. Of course, we do not expect the Board to determine the number of employees who abandoned the union because of the employer's unfair labor practices. Rather the Board should:

estimate the impact [of the unfair labor practices], taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact. . . . Similarly the 'detailed analysis' of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those factors which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

*Peerless of America, Inc. v. N.L.R.B., supra,* 484 F.2d at 1118, n. 16.

## IV. *Conclusion*

■ Accordingly, the Board's order will be enforced except insofar as it requires Armcor to bargain with the UE, or post notices to the effect that it will bargain

---

9. Indeed, at the Pizza Night, Foreman Joe DeLaquil told employees that Rossi and Burns were terminated because they were poor workers and their production was low.

with the UE. These proceedings are remanded to the Board for further analysis and findings on the necessity for a bargaining order. In light of the present posture of this proceeding, the Board, knowing that "secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support," *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. at 602, 89 S.Ct. at 1934, 23 L.Ed.2d at 571, should consider whether present conditions at the plant are still so contaminated as to warrant a bargaining order. *See N.L. R.B. v. American Cable Systems, Inc.,* 427 F.2d 446, 449 (5th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). *Cf. Clark's Gamble Corp. v. N.L.R.B.,* 422 F.2d 845 (6th Cir.), *cert. denied,* 400 U.S. 868, 91 S.Ct. 100, 27 L.Ed.2d 108 (1970).

GIBBONS, Circuit Judge (dissenting in part).

I concur in Parts I and II of Judge Rosenn's opinion and, with respect to Part III, I agree that this court should explicitly adopt the rule that whenever a *Gissel* bargaining order is adopted the Board must set forth a reasoned analysis justifying such relief. I do not agree, however, that the Board's statement of reasons for the *Gissel* bargaining order in this case was inadequate, and I do not share Judge Rosenn's doubt that the unfair labor practices found here would detract from the integrity of the electoral process. I would enforce the bargaining order as well as the order with respect to § 8(a)(1) violation and the employee discharges.