# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

**Leroy W. CRAW, Jr., Vernon E. Craw and Daniel G. Leonard, d/b/a Craw & Son, Respondent.**

No. 77–1194.

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 1977.

Decided Nov. 15, 1977.

As Amended Dec. 8, 1977.

Elliot Moore, Michael S. Winer, David A. Fleischer, National Labor Relations Board, Washington, D. C., for petitioner.

Vernon E. Craw, pro se.

Before ADAMS and GARTH, Circuit Judges, and LACEY, District Judge.*

## OPINION OF THE COURT

### PER CURIAM:

This case is before the Court upon the application of the National Labor Relations Board (NLRB) for enforcement of its order against Craw and Son.[1] In adopting the findings and conclusions of an Administrative Law Judge (ALJ), the NLRB determined that Craw had committed unfair labor practices in the course of an organizational campaign by a local union of the Sheet Metal Worker's International Association, AFL–CIO, thus violating §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act. In light of these unfair labor practices, the NLRB ordered Craw to bargain with the union, which had obtained signatures of a majority of Craw's employees on their authorization cards prior to the dispute with the employer.

The questions we must decide are, first, whether there is substantial evidence in the record to support the findings of unfair labor practices on the part of the employer

and, second, whether the bargaining order should be enforced.

### I.

In the early part of August 1974, seven of Craw's ten employees signed cards authorizing the union to act as their collective bargaining representative. On August 21, the union representative, Richard L. Steward, Jr., visited the company and asked that it commence negotiations with the union. Vernon E. (Mike) Craw refused to do so, or to look at the authorization cards. After the union's demand for recognition on August 21, Craw retained counsel and declined to meet further with the union representative. At a meeting of all employees that was called by the company on September 3, Mike Craw delivered some prepared remarks and answered questions from the employees. He declared, *inter alia*, that he could "drag out" the negotiations for "as many years as possible" until he achieved "a contract which suited him," and that during this interval there would be no pay raises. In addition, he stated that if the union were successful, "there would be a lot more layoffs."

At a meeting on September 4, attended by eight of Craw's nine production employees and the union representative, the employees voted to strike.[2] Five of the production workers subsequently went on strike and picketed the shop. A sixth employee joined the strike after about a week and picketed the shop for about two weeks before returning to work.

In the course of the strike, Mike Craw took photographs of the striking employees.[3] On the second or third day of the strike, Craw spoke with some of the strikers and asserted that they were "doing Dick

---

* United States District Judge for the District of New Jersey, sitting by designation.

1. The respondents in this action are Leroy W. Craw, Jr., Vernon E. (Mike) Craw, and Daniel G. Leonard, who do business under the name Craw & Son, a company engaged in the fabrication, installation and nonretail sale of heating and ventilation systems.

2. On the Friday before the planned Monday strike, Mike Craw assembled his employees

and told them that they had "a perfect right" to strike and to "lapse their health insurance," and that the company had a right to replace employees who failed to report for work. *See* Appendix at 9.

3. There was evidence that one of the employees walked away from the camera when his picture was taken, and that Craw followed him, saying "That's all right, we can identify you anyway." Appendix at 10.

Steward's dirty work." He also commented that, while he did not wish to be quoted on the matter, if Steward had been there and if he himself had a club, he "would use the club on Dick Steward."

Four replacements for the striking employees were hired by Craw between September 10 and September 25. The company sent letters to the strikers notifying them that they had been permanently replaced and that their health and accident insurance carrier had been informed of the termination of their employment.

The strike ended on October 3, and on the next day the five employees who had remained on strike throughout its duration informed Craw that they were ready to return to work. Only one of them, William Victor Davis, was reinstated; the others were instructed to complete employment applications, and were then informed that they would be recalled only if they were needed.[4] Although two of the replacements did not continue to work for Craw after November 1, 1974, and a third had a heart attack on December 31, 1974, rendering him substantially unable to work, none of the four strikers was reinstated by the company.

A Board-ordered election conducted on October 25, 1974, resulted in one vote for the union and five against it. Eight ballots were challenged—those cast by the four strikers who had not been reinstated and those cast by the four replacements who had been hired in September.

In an opinion dated October 22, 1975, the Administrative Law Judge determined that Craw's statement, that if the Union came into the shop there would be layoffs, was not a prediction based on "demonstrably probable consequences beyond his control" or one "based on available facts," but rath-

er constituted "a threat of retaliation based on . . . coercion . . . ." *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). It thus violated § 8(a)(1) of the NLRA.[5] Similarly, the ALJ concluded that the threat by Craw to "drag out" negotiations with the union, and Craw's comment that during the labor controversy wages would be frozen, violated § 8(a)(1).

The ALJ further stated that the justifications advanced by Craw for photographing the striking employees—namely, that the photos would be helpful in the event of violence and would accurately record the date of the picketing—were specious. Therefore, the photographing was held to violate § 8(a)(1). Moreover, the ALJ determined that Craw's threat regarding the infliction of physical harm on the union representative amounted to unlawful coercion of an employee's rights under the NLRA.

Finally, the Administrative Law Judge found that the strike was motivated at least in part by the employer's unfair labor practices and, consequently, that the strike was an unfair labor practice strike. The ALJ supported this conclusion by noting that the vote for a strike occurred at a meeting on the day after Craw's anti-union speech and discussion with the employees.

Since the strikers were participating in an unfair labor practice strike, the ALJ declared that they were entitled to reinstatement upon their unconditional application for reemployment, even if reemployment would require the discharge of their replacements. *See, e. g., KPRS Broadcasting Corporation*, 181 NLRB 535, 536 n.4. By failing to reinstate the strikers after their unconditional application for reinstatement, asserted the ALJ, Craw violated §§ 8(a)(1) and 8(a)(3) of the NLRA.[6]

---

4. None of the employees had been required to fill out an application for employment when he had been first hired by the company. Moreover, Davis was not asked to complete such an application before he was reinstated. *See* Appendix at 12.

5. *See* Appendix at 13. The ALJ also held that the employer violated § 8(a)(1) when he told his employees that if the union were successful, the welding and painting work that they per-

formed would have to be done by outside union welders and painters; and that they would likely have to be laid off if there was no other work for them to perform. *See* Appendix at 13.

6. The ALJ also determined that notifying the striking employees of their permanent replacement was a violation of 8(a)(1). *See* Appendix at 18. The ALJ went on to say that even if the strike were an economic strike, not an unfair labor practices strike, the employers' actions

As remedial measures, it was recommended that the NLRB order the employer to cease and desist from its unfair practices, and to recognize and bargain with the union.[7] After noting the precipitous drop in the union's strength during the organizational struggle from seven votes to one, the ALJ wrote:

> In the light of the Respondent's extensive and pervasive unfair labor practices which were calculated to destroy the Union's majority status, and included the termination of four of the Union's five staunchest supporters, I am persuaded that the application of traditional remedies cannot eliminate their lingering coercive effects to permit the holding of a fair and reliable rerun election.

The employees' signed authorization cards were "a more reliable measure" of their desire for union representation than the vote at the Board election, the ALJ concluded, and in these circumstances, a bargaining order was appropriate.

In a decision dated December 28, 1976, the NLRB determined that it would "affirm the rulings, findings, and conclusions of the Administrative Law Judge and . . . adopt his recommended order."[8]

On this appeal, Craw urges that there was no substantial evidence in the record as a whole to support the Board's conclusions regarding the charges of unfair labor practices, and that the bargaining order was improper. In response, the NLRB contends

that its findings regarding the employers' unfair labor practices were supported by substantial evidence, and that the bargaining order was appropriate.

## II.

### A.

■ In resolving the first issue in the case—whether there is substantial evidence to support the Board's findings of violations of §§ 8(a)(1) and 8(a)(3) of the NLRA[9] —this Court is limited in the scope of its review by the rule of *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Supreme Court there announced that a court of appeals must take into account the record as a whole, including any evidence detracting from the Board's view, in determining whether there is substantial evidence to support the Board's findings.[10]

Moreover, this Court must respect the role of the NLRB as an agency "presumably equipped or informed by experience to deal with a specialized field of knowledge . . . ."[11] We cannot displace the Board's selection between two conflicting views of the evidence, "even though the court would justifiably have made a different choice had the matter been before it *de novo*."[12]

After applying this standard of review and considering the record as a whole, it is our conclusion that the findings of the

---

were still violative of the NLRA. The reason for this was that the burden of proving that economic strikers have been permanently replaced at the time they apply for reinstatement falls on the employer, *see Trinity Valley Iron and Steel Co.*, 158 NLRB 890, 896 (1966), *enforced in relevant part*, 410 F.2d 1161, 1170–1171 (5th Cir. 1969). The ALJ concluded that the employer failed to carry its burden of proving that the replacements were permanent replacements, for two of them worked for Craw for less than two months and terminated their employment less than one week after the Board election on October 25, 1974. A third worked only until December, 1974, when he suffered a heart attack; he has worked only sporadically for Craw since then. *See* Appendix at 18–19.

**7.** It was also recommended that the four striking employees be offered reinstatement. *See* Appendix at 19, 23.

**8.** 227 NLRB No. 75 (1976), 1976–1977 CCH NLRB § 17,1708, at 29,343. The NLRB, on December 11, 1975, had adopted the ALJ's findings and recommendations; on April 21, 1976, this Court, in an unpublished order, remanded the proceeding to the Board for consideration of Craw's exceptions and the information furnished by the employer to the NLRB.

**9.** The parties framed this matter in terms of two separate issues, one of which deals with § 8(a)(1) and the other with §§ 8(a)(1) and 8(a)(3); since the standard for review is the same with respect to each, they are treated together in this opinion.

**10.** *See* 340 U.S. at 488, 71 S.Ct. 456, 465.

**11.** *Id.*

**12.** *Id.*

Board regarding the employer's unfair labor practices may not be disturbed.

### B.

The issue regarding the affirmative relief granted by the NLRB—specifically, the order that the employer bargain with the union—is more troublesome. As the Board conceded at oral argument, the decision that included the bargaining order did not discuss the particular reasons for this remedy. Instead, the Board merely adopted *en toto* the ALJ's "rulings, findings, and conclusions"[13] and did not engage in any independent analysis. Such a format contravenes our directions in *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976), and *Hedstrom Co. v. NLRB*, 558 F.2d 1137, No. 76–1700 (July 5, 1977).

As the Court wrote in *Armcor*:

In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under *Gissel* is salutary. For the reasons set forth hereinafter, we adopt it.[14]

The *Armcor* rule was said to promote the three aims of insuring informed judicial review of the Board's bargaining orders, contributing to the "predictability of this important area of labor law," and providing a "prophylaxis against arbitrary exercise of the Board's power."[15] *Armcor* concluded that the NLRB "must make 'specific findings' as to the impact of the unfair labor practices on the election process," and that it must "clearly explicate the basis for its decision to issue a bargaining order."[16]

The *Armcor* Court further noted:

What we ask of the Board should not be a great burden, nor should our require-

ment limit the issuance of bargaining orders whenever necessary. Of course, we do not expect the Board to determine the number of employees who abandoned the union because of the employer's unfair labor practices. Rather the Board should:

estimate the impact (of the unfair labor practices), taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact . . . Similarly the 'detailed analysis' of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those facts which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

*Peerless of America v. NLRB*, 484 F.2d 1108, 1118 n.16 (7th Cir. 1973).[17]

In *Hedstrom*, a case in which the Board did not accept the Administrative Law Judge's recommendation, we reaffirmed the *Armcor* ruling that the Board should make specific findings in support of the bargaining order, and should not, for example, merely characterize the unfair labor practices as "extensive" and "far-reaching".[18] The *Hedstrom* panel also noted that the Board did not properly indicate why customary relief—for example, a cease and desist order, mailing notices to employees, posting notices at the plant—would not remedy the unfair labor practices found to exist.[19]

---

**13.** 227 NLRB No. 75 (1976), 1976–1977 CCH NLRB § 17 1708.

**14.** 535 F.2d at 244.

**15.** *Id.* at 245; *see NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, Nos. 76–2256 and 77–1186 (1977), at 166.

**16.** 535 F.2d at 245.

**17.** *Id.*

**18.** In the present case, the Board did not even say this much. *See Hedstrom Co. v. NLRB*, 558 F.2d 1137, No. 76–1700 (July 5, 1977), at 1151 n.35.

**19.** *Id.* at 1152.

At oral argument in this case, counsel for the NLRB maintained that the necessity of setting forth discrete reasons, specified in both *Armcor* and *Hedstrom*, was diluted in *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, Nos. 76–2256 and 77–1186 (June 22, 1977), and that on the basis of *Eagle* the bargaining order in the circumstances presented here is proper. We do not agree.

First, it must be recalled that the affirmative relief provided by a bargaining order is not a traditional remedy under federal labor law.[20] It is appropriate, as the Supreme Court stressed in *Gissel*, only in cases in which the unfair labor practices are so "outrageous" and "pervasive" that their coercive effects could not be eliminated by customary remedies; or in which "less pervasive" practices "nonetheless still have the tendency to undermine majority strength and impede the election processes."[21] The rationale undergirding the *Armcor* ruling is that because these effects must exist in order for the bargaining order to be an appropriate remedy, the Board should be required to explain with specificity the results of the unfair labor practices and, in particular, the unlikelihood of a fair election.

The Court in *Eagle* did not diverge from this basic reasoning. Indeed, in *Eagle*, the Court noted that the bargaining order had been entered by the Board before *Armcor* was decided. This fact was said in *Eagle* to explain "why the Board's findings and analysis are not more complete."[22] *Eagle* stressed that the actions of the Board constituted what it considered to be "*minimally* sufficient compliance with *Armcor*."[23]

In addition, the Board's order in *Eagle* was not based upon a naked adoption of the Administrative Law Judge's rulings, findings and conclusions. Rather, the Board's decision:

> . . . *detailed* the unfair labor practices that it believed had undermined the possibility of 'holding a fair election in the near future, even after application of the Board's traditional remedies therefore.' (emphasis added)[24]

No such detail can be found in the Board's decision in this case. Thus, even if the Court's analysis in *Eagle* had not depended on the fact that the Board's order was issued prior to the *Armcor* decision, *Eagle* is also distinguishable from the present situation on the ground of a total lack of any independent explanation by the Board for the bargaining order in question. Accordingly, although there is sufficient evidence to support the findings by the Board of unfair labor practices, the application of the National Labor Relations Board for enforcement of the bargaining order against Craw will be denied.[25]

### III.

Accordingly, the findings of unfair labor practices will be affirmed. However, the application of the NLRB for enforcement of its bargaining order against Craw will be denied and the matter remanded for proceedings consistent with this opinion.

---

20. *See NLRB v. Armcor Industries, Inc.*, 535 F.2d at 244.

21. *See* 395 U.S. at 614, 89 S.Ct. at 1940.

22. *See NLRB v. Eagle Material Handling, Inc.*, Nos. 76–2256 and 77–1186 (June 22, 1977), at 167.

23. *Id.* (emphasis in original).

24. *Id.* at 167.

25. The Board is, of course, free to reconsider the matter of a bargaining order in light of the precepts set forth in this opinion.