**KENWORTH TRUCKS OF PHILADEL-
PHIA, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 77–1939.

United States Court of Appeals
Third Circuit.

Argued Feb. 24, 1978.

Decided March 30, 1978.

Resubmitted for Reconsideration
June 3, 1978.

Rehearing Denied Aug. 11, 1978.

D. Barry Gibbons, Gibbons, Buckley and
Smith, Media, Pa., for petitioner.

Elliott Moore, John S. Irving, Marion L.
Griffin, Norman Moscowitz, N. L. R. B.,
Washington, D. C., for respondent.

Before ADAMS, HIGGINBOTHAM, Circuit Judges, and BECHTLE, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal raises three principal issues. First, is there substantial evidence to support findings that the employer here violated Sections 8(a)(1) and (3) of the National Labor Relations Act (NLRA)? Second, should this Court enforce the order by the National Labor Relations Board (NLRB) that two employees be reinstated? Third, should the bargaining order, entered as a remedy for the employer's unfair labor practices, be enforced in the absence of an independent statement of reasons by the NLRB?

We have concluded that the record does support the findings of unfair labor practices, and that in the circumstances here, enforcement of the order of reinstatement should not be denied. However, we have determined that the NLRB has not complied with the rule that it independently should articulate the reasons why the remedy of a bargaining order is required, and thus we cannot enforce the bargaining order, at least on the record as it now exists.

### A.

Kenworth Trucks of Philadelphia, Inc., a Pennsylvania corporation engaged since 1973 in the retail sale and servicing of trucks, is the employer in the present proceeding. In the early summer of 1975, the employees of the service department of Kenworth began to talk among themselves about their dissatisfaction with the situation in the service area. Stephen Chop, a mechanic, suggested the possibility of organizing a union, and wrote to Lodge No. 724, International Association of Machinists and Aerospace Workers, AFL–CIO, which in response sent Chop authorization cards.

Between June 27 and July 1, 1975, Chop, with the assistance of Allan Thomas, also a mechanic, obtained signed authorization cards from 9 to 11 employees in Kenworth's service department.[1]

In a letter dated July 7, 1975, the union advised the employer that it represented a majority of the service department employees and requested recognition as their collective bargaining representative. This letter was received by Kenworth's President, Paul Jones, on July 10. On July 11, the union filed with the NLRB a petition for a representation election. When the election was conducted on August 15, 1975, the union lost by a vote of 6 to 5.

During the pre-election period, the employer engaged in a number of acts that, the Administrative Law Judge (ALJ) found, had violated the employees' rights under the NLRA. On July 11, Jones called a meeting of the service department employees, at which he read aloud the union's letter requesting recognition as the employees' bargaining representative. He asked the employees what they wanted from the company and requested them to "give him a chance." Then, Frank D'Amico, a supervisor, spoke about the disadvantages of a union as he had observed them in another shop. D'Amico mentioned in particular the high cost of union membership, and told the men that they would lose job opportunities because, if the shop had a union, job classifications would be instituted and they would be laid off if there were no work in a particular classification.

Responding to Jones' inquiry, the employees indicated that they wanted a 20 percent wage increase and improved hospitalization insurance. Jones said that he would comment on their request later in the day, and announced that if there were no objections, he would ask his secretary to type a letter revoking their authorizations to the union. In the afternoon of the same day, Jones informed the employees that they would

---

* United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. There is no controversy between the parties regarding the appropriateness of the service department as a unit for purposes of collective bargaining.

receive a 15 percent pay increase beginning on July 14, and another 5 percent increase on an individual basis after 90 days. Shortly thereafter, D'Amico brought a letter addressed to the union into the shop, and asked each employee to sign it. Two weeks later, the workers' paychecks began to reflect the 15 percent raise, and an increase in insurance benefits was then announced.[2]

Also, in the pre-election stage as well as on the day of the election itself, the employer's representatives made a number of comments about the union to the employees. In July or early August, Kenworth's vice-president, S. Bertram Stiff, Jr., told employee Jerry Jackson that if the union won the upcoming election, the company probably would have to discontinue providing hospitalization insurance as well as work uniforms to the employees. And on or about August 13, Jones approached Chop and asked if the company had his support in the election. Chop declined to respond. Further, on August 13, Jones spoke to Thomas and asked if he thought that a union was necessary; Thomas replied affirmatively. When Thomas failed to answer other questions, Jones remarked that he hoped that Thomas understood that with a union the company would take away all employee benefits and, as the ALJ put it, "they could start all over again. . . ."[3] On the day of the election itself, Jones told Thomas that whatever the outcome, the company would nonetheless remain a non-union shop. Also on the day of the election, Vice-President Stiff asked Kevin Partridge, a service department employee, whether he was on the company's side, and Partridge said that he was.

The major facts bearing on the events after the election concern the discharge of Chop and Thomas, who as indicated had been active in the union's organizational campaign. On the day after the election, Supervisor D'Amico and employee Graham were out of the shop on a road test, and D'Amico remarked about Thomas, who had been an observer at the election for the union, that "if he just steps out of line a little bit, he's done. . . ."

Chop was called into the service department office on August 19 and was informed that he was going to be "let go" because of his inadequate workmanship. Soon thereafter, Chop told Thomas that he had been discharged. Thomas asked Chop whether the rest of the men in the shop should walk out, for they had agreed among themselves that if anyone were fired because of union activity, the others would walk out in sympathy. A period of discussion and some confusion ensued, during which the employees stopped working and talked with each other to determine whether to walk out. D'Amico addressed some of the employees and told them to either return to work or to quit. Thomas began to clean his tools in preparation for leaving, and then waited for an opportunity to talk with the company president. D'Amico, after asking Thomas how his work was proceeding, told Thomas to proceed with work on a certain truck or risk being fired. Thomas replied that he was waiting to talk with Jones. D'Amico then announced that Thomas was fired.

2. The ALJ's opinion makes clear that the central factual dispute between the parties regarding the award of increased pay and benefits involved their timing. After reviewing the evidence on the issue, the ALJ noted:

Finally . . . it is not plausible that without any knowledge of the Union's demand for recognition or any consultation with his partner Jones granted a 15 percent increase to . . . service department employees with a promise of another 5 percent to follow, after only an hour or two of deliberation, without any precedent for general increases in the face of the economic problems Jones described to the men and at the hearing.

Thus, the ALJ credited the account of NLRB's witnesses, who indicated that the pay increase and benefit augmentation were promised only after the employer's president had read the letter from the union demanding recognition, and were apparently conceived as a response to the union's attempt to organize the shop.

3. The ALJ credited Thomas' version of these events, while noting that Jones, even when conceding that he had interrogated Thomas, testified that he never had said that benefits would be altered after an election won by the union.

Soon thereafter Chop and Thomas together left the shop, and the other employees resumed work.

About a week after the discharges, Stiff said to Partridge, "you heard what happened to Steve [Chop], didn't you?" He then asked, "you're going to play ball with us now, aren't you?"[4]

Given this evidence, the ALJ found that the employer had violated 8(a)(1) of the NLRA by soliciting employee grievances, promising wage increases, threatening employees with loss of work, circulating a petition to revoke union authorizations, and granting wage increases and insurance benefits in an effort to defeat the union. The ALJ emphasized that the employer's conduct clearly was triggered by the union's letter requesting recognition and was "designed to introduce the employees to abandon the union . . . ." Also, the ALJ found that Kenworth violated Section 8(a)(1) by coercively interrogating employees about their union sympathies, threatening loss of benefits in the event that the union won the election, and proclaiming that the shop would remain nonunion whatever the outcome of the election.

As to the termination of Chop, the ALJ ascertained that the evidence supported an inference that the employer had an intent to retaliate against active supporters of the union, in particular Chop. Moreover, after reviewing the applicable evidence in detail, the ALJ indicated that, in his view, the company's explanation for discharging Chop was "jerry-built" and unbelievable.[5] In light of the proffered pretext for firing Chop, the timing of his discharge, and the finding regarding the employer's anti-union animus, the ALJ concluded that Chop had been discharged in violation of Sections 8(a)(3) and (1) of the NLRA.

And as to the firing of Thomas, the ALJ found that Thomas, at the time of his discharge, was engaged in protected concerted activity within the shop. His termination, based as it was on the protected activity in which he was involved, was thus held to be in violation of 8(a)(1) of the NLRA.

After discussing these unfair labor practices by Kenworth, the ALJ recommended that the employer be ordered to cease and desist from its illegal actions, and to reinstate Chop and Thomas. Also, the ALJ recommended that a bargaining order be entered, for, as the ALJ found, the employer's unfair labor practices made "the likelihood of a fair and free rerun election infinitesimal . . . ."

On May 20, 1977, the NLRB indicated that it had "decided to affirm the rulings, findings, and conclusions of the Administrative Law Judge . . . ." with minor modifications.[6] Kenworth petitioned for a review of the Board's decision and order, and the NLRB filed a cross-application for enforcement of its order.

### B.

The scope of an appellate court's review of the findings regarding unfair labor practices is constrained by the principle of *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that such a tribunal must look to the record as a whole in determining whether there is substantial evidence to support the findings. *See NLRB v. Craw,* 565 F.2d 1267, 1270 (3d Cir.

---

4. This rendition of the conversation, the ALJ indicated, was based upon Partridge's testimony; at the hearing Stiff did not testify regarding the particular conversation in which such a comment was said to have been made.

5. The ALJ further said, regarding Chop's discharge:

I conclude that the reason given by Respondent for Chop's discharge was a pretext and that the jobs described . . . (as the basis for the conclusion that Chop lacked workmanship) were selected from those on which rework was required without regard to

Chop's responsibility for the rework in order to provide an apparent justification for discharge for other reasons.

6. The Board wrote, in pertinent part:

The Board has considered the record and the attached decision in light of the exceptions and briefs and has decided to affirm the rulings, findings, and conclusions of the Administrative Law Judge and to adopt his recommended Order, as modified herein.
229 NLRB No. 122, 1977–78 CCH NLRB ¶ 18,-236 (May 20, 1977).

1977). In addition, a reviewing court must respect the role of the NLRB as an agency "presumably equipped or informed by experience to deal with a specialized field of knowledge . . ." 340 U.S. at 488, 71 S.Ct. at 465. Thus, even if "the court would justifiably have made a different choice had the matter been before it *de novo*," an appellate court may not displace the Board's selection between "two fairly conflicting views" of the evidence. *Id.*

In light of this standard of review, and after considering all of the evidence bearing upon the charges of unfair labor practices on the part of Kenworth, we have concluded that the findings regarding such practices should not be disturbed.

The second issue in the case—relating to the reinstatement order—also turns on a factual question, namely, whether the discharges of Chop and Thomas were prompted by the activities of these employees in furthering the union's attempt to organize the shop. Kenworth hotly disputes such a supposition. It claims that the discharge of Chop was proper because it was based upon his lack of workmanship, and that the Thomas termination was permissible because the employer had no knowledge that Thomas was engaged in concerted activity in the shop.[7]

Because the second issue is actually a variant of the first, it hinges primarily on the question whether the findings by the ALJ relating to the discharge of Chop and Thomas are supported by substantial evidence. Based on the record before us, we have concluded that they are so grounded, and thus the reinstatement orders are proper.

The most troubling issue in the present appeal relates to the propriety of issuing a bargaining order in the absence of a specific statement by the NLRB of the reasons for such an order. The NLRB takes the position that because it adopted the findings and conclusions of the ALJ, and because the

ALJ is an agent of the Board, the Board itself in effect set forth the basis of the bargaining order. Yet, such a rejoinder does not take account of the requirement established in a series of decisions by this Court that the NLRB itself should give the reasons for a bargaining order if it wishes this Court to enforce such order. See *NLRB v. Craw,* 565 F.2d 1267, 1271–72 (3d Cir. 1977); *Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1150–1152 (3d Cir. 1977); *NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 166–168 (3d Cir. 1977); *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 244–245 (3d Cir. 1976).

*Craw* is the most recent discussion of the subject by this Court. In *Craw,* it was noted that the NLRB, in issuing a bargaining order, did not discuss the particular reasons for the remedy, but instead adopted *in toto* the ALJ's rulings, findings and conclusions. Such a lack of "any independent analysis" by the Board, 565 F.2d at 1271, was said to contravene the direction in *Armcor,* which stressed that because it was general labor policy to select bargaining representatives in an election, "a rule requiring *the Board* to set forth a reasoned analysis justifying a bargaining order under *Gissel* is salutary." (emphasis supplied) And in the next sentence the *Armcor* court went on to announce that "we adopt" such a rule. 535 F.2d at 244, *quoted at* 565 F.2d at 1271.

The rationale for the requirement that the NLRB itself "clearly explicate the basis for its decision to issue a bargaining order," and make " 'specific findings' as to the impact of the unfair labor practices on the election process," 535 F.2d at 245, was predicated, in the first instance, on a recognition that a bargaining order is not a traditional remedy under federal labor law. *See* 535 F.2d at 244. For a bargaining order to be warranted, an employer's unfair labor practices must either be so " 'outrageous' " and " 'pervasive' " as to eliminate the possibility that customary remedies will be effective,

---

7. At oral argument, counsel for Kenworth contended that Thomas was acting in an individual capacity prior to his departure from the shop, that in fact Thomas had himself quit work, and thus he could not have been discharged by Kenworth.

or if "less extraordinary" they must have a "tendency to undermine majority strength and impede the election processes," under the Supreme Court's analysis in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 613–614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). Because these negative effects must be deemed to exist, as *Craw* noted, it is fitting for the Board to *"explain with specificity* the results of the unfair labor practices and, in particular, the unlikelihood of a fair election,"* 565 F.2d at 1272 (emphasis supplied), before seeking enforcement of a bargaining order.[8]  *Craw* and *Armcor* emphasized further that the principle requiring the NLRB to state the reasons for a bargaining order serves three aims: those of guaranteeing "informed judicial review" of the bargaining order; contributing to the " 'predictability of this important area of labor law' " by having the Board itself lay out its reasoning when it issues such an order; and providing a " 'prophylaxis against arbitrary exercise of the Board's power.' "  565 F.2d at 1271 (footnote omitted), *quoting* 535 F.2d at 245.

It might be said that such ends can just as well be served by having the ALJ fully set forth his reasons, and by allowing the NLRB simply to ratify what the ALJ had said.  However, this Court has already rejected such a position in its recent decisions, and in addition the suggestion would appear to be unpersuasive.  The ultimate authority in the area of the NLRB's activity is, of course, the Board itself, not the ALJ.

What is warranted is some guarantee that the NLRB, not just the ALJ, has carefully considered and sifted the evidence of unfair labor practices in determining whether the remedy of a bargaining order is needed.[9]

The requirement which we reaffirm here should not be a burdensome one for the Board to discharge, for an elaborate explanation of the factors giving rise to the conclusion that a bargaining order is needed is not essential.  As has been said repeatedly, it is only expected that the Board:

> estimate the impact (of the unfair labor practices), taking into account the factors in the particular case which are indicative of actual effect or which plausibly, in the light of existing knowledge, would contribute to or detract from an actual impact  .  .  .  Similarly the 'detailed analysis' of the likelihood of recurring misconduct and of the potential curative effect of ordinary remedies only requires an appraisal of those factors which might reasonably have a bearing, such as whether the employer has a history of anti-union animus and Labor Act violations, whether the employer has taken an affirmative rectifying measures or otherwise indicated his cooperativeness in assuring a fair election, etc.

*Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1118 n.16 (7th Cir. 1973), *quoted* in *Armcor, supra,* 535 F.2d at 245, and *Craw, supra,* 565 F.2d at 1271.[10]

---

8.  *See also Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1150–1152 (3d Cir. 1977); *NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 166–168 (3d Cir. 1977).  In *Hedstrom,* this Court emphasized that the Board's reasoning in support of the bargaining order was unduly conclusory, for the Board "did not indicate the reasons it concluded a fair rerun election unlikely, nor did it assess the past history of employer interference."  558 F.2d at 1151 n.35.  And as this Court stressed in *Craw,* 565 F.2d at 1272, *Eagle Material Handling* did not diverge from the reasoning in *Armcor* and *Hedstrom.*  Rather:

> .  .  .  in *Eagle,* the Court noted that the bargaining order had been entered by the Board before *Armcor* was decided.  This fact was said in *Eagle* to explain 'why the Board's findings and analysis are not more complete.'  *Eagle* stressed that the actions of the Board constituted what it considered to be 'mini-

> mally sufficient compliance with *Armcor.*' (footnotes omitted)
565 F.2d at 1272.

9.  This is not to say that the necessity of a reasoned elaboration of the basis for a bargaining order by itself will assure that a careful weighing of the evidence has occurred, but it should help to further such an aim.  *Cf.* Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1292 (1975) ("The necessity for justification is a powerful preventive of wrong decisions.").

10.  It should be noted that the present opinion does not hold that *no* reference to the ALJ's findings or conclusions is acceptable in the context of an independent explanation by the Board of a bargaining order.  Rather, the point is that the NLRB should not simply make mere

Consequently, in view of the requirement that the NLRB itself should undertake to articulate independently the basis of a bargaining order that it will seek to have this Court enforce, and not merely adopt the ALJ's findings and conclusions, we must at this time deny the NLRB's application for enforcement of the bargaining order against Kenworth, for no such independent explanation by the Board has thus far been given.

## C.

Accordingly, the findings of unfair labor practices, which are supported by substantial evidence, will not be disturbed, and the order of reinstatement will be enforced. However, the application of the NLRB for enforcement of its bargaining order against Kenworth will be denied.[11]

## OPINION ON REHEARING

ADAMS, Circuit Judge.

The panel, having granted the NLRB's motion for rehearing, has the task of reconsidering the mandate of its earlier opinion in light of *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), decided shortly after we handed down the original decision in this matter. At issue is that aspect of the opinion dealing with the remedy of a bargaining order and, in particular, the direction that the NLRB itself state the reasons for such an order where, as here, the administrative law judge had provided a statement of the considerations prompting him to recommend a bargaining order. Because the panel has come to the view that its earlier determination with respect to the remedy of the bargaining order should not be sustained in light of principles enunciated in *Vermont Yankee Nuclear Power, supra,* we

have determined that that portion of the earlier opinion and mandate should be vacated.

It is well to consider at the outset how the law relating to bargaining orders in labor cases has evolved in the recent opinions of this Court. The focal point for decisional analysis, as we see it, is the Supreme Court's discussion in *N.L.R.B. v. Gissell Packing Co., Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissell,* the Court set forth the doctrine that bargaining orders, although not disfavored under the federal labor laws, constitute a type of remedy that should be employed only in situations clearly requiring such relief. Specifically, since a bargaining order displaces the normal mechanisms for electoral selection of bargaining representatives and injects the NLRB into the heart of the process of collective bargaining, such relief, *Gissell* declares, should be carefully confined to contexts wherein the underlying unfair labor practices make impossible or highly unlikely the prospect of an election based upon the employees' free choice. *See* 395 U.S. at 612–16, 89 S.Ct. 1918.

Such a position is founded on a sensitivity to the role of a court in reviewing cases originating in proceedings before the NLRB, namely, that of being asked to enforce or not to enforce a given remedy imposed by the Board. When so requested to act, *Gissell* emphasizes, a court is effectively called upon to ascertain whether a bargaining order should not be enforced because the underlying circumstances do not sufficiently warrant such relief. *See id.*

■ Given *Gissell's* analysis of bargaining orders, a court of appeals, in determining whether the standards of *Gissell* have been satisfied, needs to have before it, at the very least, a statement of the reasons leading the administrative agency to impose a bargaining order.[1] That is the basic point

---

reference. Instead, it should advance its own analysis of the factors leading to the conclusion that a bargaining order is necessary.

**11.** The NLRB is, of course, free to reconsider the matter of a bargaining order in light of the precepts set forth in this opinion.

**1.** As a general matter, the NLRB must disclose the foundation of its orders. *See N.L.R.B. v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). Section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 557(c)(3)(A), provides that decisions by administrative agencies must include "find-

undergirding the notion, expressed by this Court in *N.L.R.B. v. Armcor Industries, Inc.*, 535 F.2d 239, 244–45 (3d Cir. 1976), that before a court of appeals may enforce a bargaining order, the record should contain an elaboration of the basis for the determination that such relief is necessary.[2] That stance has been reaffirmed in subsequent cases of this Court. *See Hedstrom Co. v. N.L.R.B.*, 558 F.2d 1137, 1150–52 (3d Cir. 1977); *N.L.R.B. v. Eagle Material Handling, Inc.*, 558 F.2d 160, 166–68 (3d Cir. 1977).[3]

However, the standards of *Gissell* do not directly compel the result reached by the panel in its earlier decision in this case, which is that the Board itself must set forth the basis of a bargaining order in an independent statement, and may not simply incorporate by reference the comments of the ALJ. On reflection, it does not appear that such conclusion constitutes an implementation of the concept that *some* statement of reasons for the remedy of a bargaining order—whether made by the ALJ, or by the NLRB itself—is required before enforcement of that order.

In *Vermont Yankee Nuclear Power*, the Supreme Court stressed its concern about the danger that courts of appeals might misread or misapply "statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." 435 U.S. at 525, 98 S.Ct. at 1202. Although *Vermont Yankee Nuclear Power* dealt with a factual and administrative context different from that here and, in particular, involved the review of rule-making rather than of adjudicatory procedures, it expresses the basic philosophy that agencies should be relatively free to establish their own procedures and mechanisms for decision-making on subjects within the scope of their expertise.

Such an orientation of deference to agency procedures should not be adopted in an unmodulated fashion in every case, for to do so would effectively nullify the power of courts to oversee the fairness and legal propriety of agency-established procedures. However, the spirit of *Vermont Yankee Nuclear Power* must be given attention in a situation such as this one, where the question is posed whether the particular procedural requirement previously established by this panel should be sustained.

Upon reconsideration, we believe that the mandate of the prior opinion dealing with the bargaining order should not be upheld. So long as the ALJ has provided a statement of reasons for its recommendation of a bargaining order as it did here,[4] and so

---

ings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record . . ."

**2.** *See* 535 F.2d at 244 ("In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under *Gissell* is salutary. For the reasons set forth hereinafter, we adopt it.")

**3.** *Cf. N.L.R.B. v. Craw*, 565 F.2d 1267, 1271–72 (3d Cir. 1977). In *Craw*, the Board "merely adopted *en toto* the ALJ's 'rulings, findings, and conclusions' and did not engage in any independent analysis." The Court concluded that "(s)uch a format contravenes our directions in *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976), and *Hedstrom Co. v. NLRB*, 558 F.2d 1137 . . ." *Id.* at 1271. To the extent that *Craw* takes a position that is inconsistent with *Vermont Yankee Nuclear Power, supra,* it of course is no longer viable.

**4.** As the ALJ wrote:

The evidence . . . shows that by July 1, the Union had signed authorization cards from 9 to 11 employees, a clear majority, in a bargaining unit which is admitted to be appropriate. Between that time and the date of the election [in August] Respondent granted substantial unprecedented across-the-board wage increases and improved hospitalization insurance and solicited and obtained signatures of all employees to a petition purporting to withdraw their union authorizations. As the election approached, Respondent's officers engaged in coercive interrogation, threatened loss of benefits, and conveyed the futility of an affirmative vote. Coercion did not end with the Union's narrow election loss, but continued with the discharges of Chop and Thomas [the main union proponents] and the threats of discharge made to [unit employees] Graham and Partridge.

long as the NLRB has specifically indicated its adoption of the findings and reasoning of the ALJ, as was done in the present case,[5] the need for a separate elaboration of the factors prompting a bargaining order would appear to have been met. To go beyond that by asking the NLRB itself to provide an independent statement of reasons would seem to impose a requirement of "proper procedures" upon an agency "entrusted with substantive functions by Congress," and thus to be inconsistent with the approach taken in *Vermont Yankee Nuclear Power*.

We therefore have concluded that the portion of the earlier opinion and mandate dealing with the bargaining order will be vacated, the company's petition for review of the Board's order will be denied and the Board's order will be enforced.[6]

These circumstances were the basis for the conclusions reached by the Administrative Law Judge and adopted by the Board:

> The question as to whether a bargaining order should issue is not close. The scope and extent of Respondent's unfair labor practices in this case both before and after the election make the likelihood of a fair and free rerun election infinitesimal and require that the Union's status as representative of Respondent's employees be ascertained on the basis of its authorization cards. [Footnotes omitted.]

5. The NLRB said:
> The Board has considered the record and the attached Decision in light of the exceptions and briefs and has decided to affirm the rulings, findings, and conclusions of the Administrative Law Judge and to adopt his recommended order as modified herein.

6. The holding in this case is limited to a situation such as the present one, where the ALJ has provided a rational statement of the reasons for a bargaining order and the NLRB has adopted such a statement.