**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GARRY MANUFACTURING COMPANY, Respondent.**

No. 79–2113.

United States Court of Appeals, Third Circuit.

Argued June 10, 1980.

Decided July 31, 1980.

Peter M. Bernstein, Susan L. Williams, [argued] Attys., N. L. R. B., Washington, D. C., for petitioner.

Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., Stephen A. Ploscowe, Newark, N. J., [argued] Theodore M. Eisenberg, Grotta, Glassman & Hoffman, P. A., Newark, N. J., for respondent.

Before GIBBONS, WEIS and SLOVI-TER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This case comes before us on the petition of the National Labor Relations Board, pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976), seeking enforcement of its bargaining order against Garry Manufacturing Company.

Although the facts are hotly disputed, it appears that three Garry employees first decided in April of 1977 that a union would be beneficial to them and their co-workers and spoke to representatives of District 65, an affiliate of the Distributive Workers of America, concerning the possibility of an organizational drive at Garry. When on May 17 the Union allegedly had received signed authorization cards from a majority of Garry's 130 production and maintenance employees, a representative of the Union met with Rudolph Koppel, Garry's President, and his son, Harry, the executive vice president, and requested recognition. When the Koppels refused, the Union filed a petition with the Board for a representation election, which election was set for June 29.

Both sides conducted a vigorous campaign. Leaflets and answering leaflets centered on the issues of job security, wages, benefits, and the advantages or dangers of unionizing. The Board found that the Company's literature contained threats of reprisals and promises of benefits, both im-permissible under section 8(a)(1) of the Act. During this same time, Rudolph Koppel suffered a phlebitis attack. He set up a telephone communications system to answer questions about the Union or the election and to hear employees' grievances, ostensibly because his illness prevented normal personal contacts. The Board found that this was a solicitation of grievances and an implied promise of benefit which violated section 8(a)(1).

On June 20, 1977, near the end of the campaign, the Company undertook a major transfer of machinery from the plant. The Company argued that the transfer was one of seven occurring at fairly regular intervals throughout 1977 and that the purpose of the transfer was to move idle machinery and create room for greater productive capacity. However, the Board found that, in the context of the campaign and the job security theme of the Company's leaflets, this movement of machinery was intended to create the impression that the Company could and would retaliate if the Union won the election. Therefore the Board found that this transfer also violated section 8(a)(1) of the Act.

Moreover, on June 26, 1977, three days before the election and on a day on which the Union had planned to hold its final rally, the Company sponsored an outing at Great Adventure. The Company argued that it had decided to sponsor the outing in December 1976 but had delayed announcing it and had considered cancelling it while awaiting the advice of counsel concerning whether holding the outing would be an impermissible benefit. The Board found that the outing was in fact a benefit and an implied promise of future benefits which violated section 8(a)(1).

Furthermore during the final week prior to the election, one of the Company's supervisors discussed past and possibly future wage increases with one or two of the employees. Again, the facts are hotly disputed, but the Board found that the supervisor promised two employees a wage increase if the Union lost the election, which was also a violation of section 8(a)(1).

Finally, during the election campaign, a supervisor issued written disciplinary notices to two of the union organizers, when admittedly in the past the practice had been to give oral warnings. The Company argued that these employees had begun so to abuse break time and tardiness privileges that the Company's informal discipline system was becoming ineffective. The Board found, however, that the change in discipline was directed almost solely at Union supporters and therefore constituted a violation of section 8(a)(3).

The Union lost the election by a vote of 67 to 46 and filed timely objections to the election and unfair labor practice charges against the Company. The Board, in addition to the findings outlined in the preceding paragraphs, found that the Company obstructed the Board's investigation of the Union's charges in violation of section 8(a)(1). Coupled with its other findings of section 8(a)(1) and section 8(a)(3) violations, the Board determined that the election must be set aside and that a free and fair election in the future was extremely unlikely. It therefore ordered the Company to cease and desist, to expunge the disciplinary reprimands, and to recognize and bargain with the Union upon request. The Board petitions for the enforcement of this order.

## I.

In reviewing an enforcement petition, the standard to be applied is whether substantial evidence in the record as a whole supports the Board's findings of fact and whether these findings are sufficient to support, in turn, the Board's conclusion that the Company committed an unfair labor practice. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Comm'n.*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126

(1938). Moreover, this court should not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

> Section 7 of the Act guarantees to employees the right to self-organization, to form, join, or assist labor organizations . . . for the purposes of collective bargaining or other mutual aid or protection[.]

29 U.S.C. § 157. In order to make effective this guarantee, section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed· in section [7]." *Id* § 158(a)(1). The appropriate standard to be applied in reviewing the Board's finding of a section 8(a)(1) violation is

> whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.

*Local 542 v. NLRB*, 328 F.2d 850, 852–53 (3d Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). *Accord, NLRB v. Armcor Indus., Inc.*, 535 F.2d 239, 242 (3d Cir. 1976); *NLRB v. Triangle Publications, Inc.*, 500 F.2d 597, 598 (3d Cir. 1974) (per curiam). Section 8(a)(3) provides that it shall be an unfair labor practice to "encourage or discourage membership in any labor organization" by discriminating "in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3). The appropriate standard for reviewing the Board's finding of a section 8(a)(3) violation is whether the employer intended to discourage union activity. *NLRB v. Armcor Indus., Inc.*, 535 F.2d at 243. Section 8(c) of the Act guarantees to employers the right to communicate their opinions and facts about unions during an organizational campaign. That section provides that

[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, *if such expression contains no threat of reprisal or force or promise of benefit.*

29 U.S.C. § 158(c) (emphasis added).

## II.

■ In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held that, in the course of an organizational campaign, an employer may freely communicate to his employees his views on unions in general or on the union they propose to join in particular as long as he does not violate the command of section 8(c) by including threats or promises. With respect to predictions as to the effect of unionization, the Court held that whether such predictions violate section 8(a)(1) will depend upon two factors: the extent to which the prediction is based on demonstrable probabilities; and the extent to which the adverse consequences warned of are within the employer's control. *Id.* at 618, 89 S.Ct. at 1942; *see Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 9–11 (3d Cir. 1969) (deference to Board expertise on whether threat implied; *Gissel* not limited to organizational campaign context). The question before this court is whether the statements made in this organizational campaign constituted threats of adverse consequences prohibited by section 8(a)(1) of the Act. There need be no proof of any actual interference with employees' rights; there need only be a finding that the statements or acts of the employer would tend to coerce a reasonable employee. We have held that the courts should defer to Board expertise, particularly where, as here, the employees may be especially sensitive to implied threats. *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 9 (3d Cir. 1969). With these standards in mind, we turn to a review of the several violations of section 8(a)(1) found by the Board.

■ The Board found that the Company had violated section 8(a)(1) by including both threats of reprisals or adverse consequences and promises of benefit in the Company's campaign literature, implying reprisals through its movement of machinery out of the plant, soliciting employee grievances, promising wage increases, and sponsoring an outing for the employees and their families. We find that substantial evidence in the record as a whole supports each of these findings.

### A. *Threats of Reprisals in The Campaign Literature*

The record contains numerous leaflets distributed to the employees and speeches read to them by the Company in the course of the election campaign which the Board found contained threats of reprisals or adverse consequences in violation of section 8(a)(1). These materials contain offending statements falling roughly into two categories: statements concerning the possible adverse consequences of unionism per se; and statements concerning possible effects of unionism on the plant. Summarizing these leaflets and speeches, the Board found:

[the] Respondent repeatedly drove home the message that, on the one hand, unionization would threaten continued employment and job security and inevitably result in strikes and violence while, on the other hand, rejection of unionization would result in improved benefits and working conditions.

242 N.L.R.B. No. 94, slip op. at 3 (1979). The Company made several types of statements alluding to the possible adverse consequences of unionizing: the possibility of strikes and violence; the imposition of dues; and the limited bargaining rights of unions in general. The Board focused on the threat of strikes to support its implied threat analysis.

In *Gissel* the Supreme Court held that an employer may communicate his views of unions either in general or in particular and may make predictions of strikes and plant closure. Such statements are not threats in violation of section 8(a)(1) if the prediction

is based on objective facts and the event warned of is based on factors not within the employer's sole control. *Id.* at 618, 89 S.Ct. at 1942. The line between an objective fact beyond the employer's control and a threat is never easy to define. In this case, the employer made clear that he expected that the Union's demands would be unreasonable and would force him into a position in which he would be unable to compete. Objectively viewed, that statement is not unreasonable. Although no demands had been presented, the Union's literature consistently compared Garry's wages to those of Revlon, another local employer, but one engaged in an industry in which wages were generally significantly higher. Moreover, the distribution of newspaper articles concerning District 65's history of strikes also appears to ground his statement on objective fact. However, the employer's underlying message was that he firmly believed that wages were already as high as could be expected and that he would not agree to any increases greater than those granted in the past. Although he stated that he would bargain in good faith, he also made clear that the Union could only succeed by resort to economic coercion, which he would resist. Under the *Gissel* test, then, although the comments concerning the possibility or even likelihood of a strike were perhaps based on objective fact, the employer evidenced a willingness to force the union to strike, thus making the threatened consequence more or less within his control.[1]

The Company also made several types of statements concerning the possible adverse effects of unionism on the Company: loss of job security; loss of competitive position; loss of flexibility; and possible closure. The Company stated that job security can only be guaranteed by the employer and that the only power that the Union would have in this regard would be its bald right to negotiate.[2] In a speech given shortly before the election Harry Koppel said that the Union could insist upon demands which, if forced upon the Company, would make the Company unable to compete.[3] Koppel also stated to the employees that the Union would cause the loss of flexibility at the plant. This flexibility, Koppel stated, made possible both the acceptance of small orders, which ensured full employment, and the completion of such orders, which kept the Company ahead of its competitors. Loss of that flexibility, he implied, would result in layoffs and loss of competitive advantage.

Finally the Company threatened plant closure. In an Open Letter to the employees, for example, the Management stated:

> Be wise when voting on Wednesday. Remember the fate of the employees of Mack Truck, the Textile Mills and many others that were located in the past in the New Brunswick area.
>
> When you are thinking about whether or not to vote for a union, ask yourself these questions:
>
> > Are you organizing your plant *out of a competitive position*?

1. As Harry Koppel stated in his speech one week prior to the election,

   We have examined a number of District 65 contracts and the wage settlements that they have obtained are in general less than you have.

   .　　.　　.　　.　　.

   Don't let the Union mislead you about strikes. District 65 had strikes. In an economic strike a company has the right to hire replacement workers. But we certainly hope we won't have one here and will do all we can to avoid one.

2. As Harry Koppel stated in his speech,

   No union can give you job security. What they talk about is giving you protection from arbitrary firing. . . . You have this kind

of security now and do not need to pay union dues for it.

Now let us talk about real job security. Real job security means a pay check every week, an excellent insurance program including Blue Cross, Blue Shield, and a major medical plan to take care of all your health needs, plus life and disability insurance.

Rudolph Koppel circulated a memo echoing the same theme, which stated in relevant part, "*ONLY* GARRY CAN AND WILL PROTECT YOUR JOBS AND YOUR FUTURE AND YOUR STEADY PAYCHECKS."

3. The Company referred in particular to Mack Truck, a local employer that allegedly was forced to close and move elsewhere because high union demands made it impossible for it to compete.

Are you organizing yourself *out of regular employment* and *liberal overtime* ?

DON'T EXPERIMENT!

DO NOT GAMBLE with your secure jobs, your future benefits and that steady paycheck.

The message of the management is very clear in this letter. Along with the other statements made by the Company in the course of the campaign, it constitutes substantial evidence on which the Board properly relied for its finding that the employer's statements were impermissible threats of reprisals or adverse consequences.

In determining whether a particular statement or group of statements constitutes an implied threat, the court must give considerable deference to the Board's expertise. As we held in *Mon River Towing* :

[a]s the economic dependence of employees on their employer may cause them to be peculiarly sensitive to nuances in language which would be lost on a neutral observer, the possibility that a statement contains an implied threat must be judged from the employee's point of view. For this reason the expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer.

*Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 9 (3d Cir. 1969) (footnotes omitted). In this case, the numerous thinly veiled statements concerning adverse consequences and the emphasis on the strength of the employer and his willingness to fight the Union are sufficient to constitute a violation of section 8(a)(1). Particularly when viewed in light of the *Gissel* test for permissible commentary on unions, the statements were intended to be and were understood as threats, outside of the protection of section 8(c) and in violation of section 8(a)(1). The Board's finding in this regard is supported by substantial evidence in the record as a whole.

## B. *The Movement of Machinery*

On June 20, 1977, approximately 15 pieces of machinery were removed from the plant. The Company argues that the movement was one of several such moves and was necessary in order to create room for expansion into a new department. The testimony is conflicting with regard to both the necessity for and the frequency of such movements of machinery.[4]

It is clear that the plant was overcrowded and that storage space was needed for chemicals for the new department which was under construction. It is also clear, however, that newly-ordered machinery was put on hold in late June and not delivered until after the election. If the removal on June 20 was intended, as Koppel testified, to alleviate the overcrowding, then there was no point in putting new deliveries on hold on that date, as occurred in at least

---

4. Al Trojanowski, a foreman with about 20 years of experience at Garry, who was in charge of moving machinery, testified that such movements were common. In 1977, he said, there were more than half a dozen such moves, and a move of similar proportions to the June 20 movement had taken place during January. He said that no working machines were moved, although by his estimate about 75% of the machines moved that day were taken off the production floor. He further testified that the move was for the purposes of removing idle, non-functioning or troublesome equipment, clearing the aisles, and making room for storage associated with the expansion then underway, and that the space created by the removals was not left vacant, but was used for storage of chemicals for the new department.

Harry Koppel's testimony generally followed the same lines. Although he admitted that the Albe machines that were removed were operational, he testified that most of the machinery moved had been idle for a long time, a statement which conflicts with Trojanowski's characterization of the movement procedure as nearly constant. Koppel said that he did not select June 20 for the move; he said that he had told the purchasing agent to make room for new equipment about 45 days prior to the move.

Ronnie Taratko, one of the members of the Union's organizing committee, testified that seventeen machines were moved out on June 20, and that the two Albes had been working that morning, and that although the plant was crowded, none of the pieces removed had been idle for very long. Although she admitted that she had no knowledge of the frequency of removals, she remembered only one or two pieces being removed prior to June 20.

one instance,[5] because once the removal had been accomplished, sufficient room should have been available. Moreover, the evidence is in conflict over whether the empty spaces were filled immediately or not and whether the removed machinery was in use or not. There is evidence, however, that at least some employees understood the June 20 movement to be in preparation for closing the plant if the Union won the election.[6]

Although this is a closer question, there is substantial evidence to support the Board's finding that the removal was timed so as to be understood as a threat of reprisal should the Union win the election. The standard set forth in *Armcor*, wherein the court relied on the *Local 542* tendency to coerce or intimidate a reasonable employee test, and the *Armcor* deferential standard of review require that we affirm the finding by the Board that the removal violated section 8(a)(1).[7]

### C. Promises of Benefits In Campaign Literature

Under section 8(a)(1), it is also an unfair labor practice, not protected by section 8(c), for an employer, in the course of an election campaign, to make implied or explicit promises of benefit in exchange for the defeat of the Union in the election. The Supreme Court, in *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), described broadly the prohibition of section 8(a)(1) with respect to benefits and promises of benefits granted by an employer during an organizational campaign:

> We have no doubt that [section 8(a)(1)] prohibits . . . conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect. . . . The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

*Id.* at 409, 84 S.Ct. at 460. In *Exchange Parts*, shortly prior to the election the employees first were granted an additional holiday. Second, in a letter to the employees, the Management stated in part "the Union can't put any of those [previously listed benefits] . . . in your envelope—*only the Company can do that.*" *Id.* at 409 n. 3, 84 S.Ct. at 460 n. 3 (emphasis in original). Although under *Gissel* this comment might be interpreted as an implied threat which violates section 8(a)(1), under *Exchange Parts* it is an implied promise of future benefits as well.

In its leafletting campaign against the Union, Garry Manufacturing Company made several statements that the Administrative Law Judge and the Board agreed were impermissible promises of benefit. In several pieces of literature distributed to the employees, the Company listed past benefits and promised to "do even better in the future" or stated that "nobody [would]

---

**5.** The record contains several letters, one dated June 20 and which confirmed a telephone hold notice of June 16, placing on hold machinery that had been ordered. All of the hold orders were issued after the date when recognition was demanded.

**6.** Dorothy Dickhut, a member of the organizing committee, claimed that there was panic and fear among the employees. Apparently because the committee had assured the employees that the management could not close the plant during the organizational campaign some of the employees who feared that the plant was being closed went to Dickhut for reassurance. From this, she concluded that they were afraid. Her testimony concerning the effect on the em-

ployees was corroborated by Ms. Goodhart, who said that she first became aware of the equipment removal when her boss, Ann Fisko, "came running into the room crying that they were taking two of her Albes Machines out." Goodhart further testified that Fisko said that "she didn't know why they were moving them because they needed them for the production."

**7.** Although the Board did not specifically mention the removal of machinery in its opinion, the Board did adopt the findings and conclusions of the Administrative Law Judge, which included the removal of machinery as a part of the employer's overall anti-union conduct that formed the basis for the finding of the section 8(a)(1) violation.

regret it" if the Union lost the election.[8] Tested against the *Exchange Parts* doctrine, the statements made by the Company were implied promises of future benefits in exchange for the Union's defeat. The numerous references to management's power to confer future benefits and the veiled promises implicit in statements that the Company would do even more in the future certainly are no less offensive than the comments relied on by the Court in *Exchange Parts*. Although the Koppels took care to state in their speeches that they could not make any promises, the fact of the matter is that they worded their leaflets to convey the message that only the Company could confer future benefits on the employees and that, given the chance, they would do so. This conclusion is reinforced by letters written by employees and distributed by the Company which stated that they had in fact understood the Koppels' various statements to mean that more benefits would be forthcoming if the Union lost the election.

The Board, in adopting the findings of the Administrative Law Judge, agreed that the leaflet and speech campaign drove home the message of better future benefits in exchange for the Union's defeat. Under the *Exchange Parts* test, these statements were implied promises of benefits and were impermissible under section 8(a)(1). Under *Mon River Towing*, the Board's expertise is relevant to both implied threats and implied promises of benefits aimed at employees sensitive to the apparently overwhelming power of the Company. *Mon River Towing, Inc. v. NLRB*, 421 F.2d at 9–10. Under *Armcor*, we must accept the fact findings of the Board as to the impermissible promises contained in these leaflets. *NLRB v. Armcor Indus., Inc.*, 535 F.2d at 242.

### D. *Promises of Benefits: Garry Hot Line*

■ In the middle of the campaign, Rudolph Koppel suffered a phlebitis attack and was unable to be at the plant for several days. During this time, he announced the establishment of the Garry Hot Line, a telephone number that employees could call with questions or comments. The questions, along with Koppel's responses, were printed and distributed to all employees. In his memo establishing the Hot Line, Rudolph Koppel stated

> Here's your chance to *ASK YOUR QUESTIONS AND GET ANSWERS FROM ME REGARDING UNION ACTIVITIES AND ANYTHING ELSE ABOUT THE COMPANY.*
>
> .     .     .     .     .
>
> Call ME at the special direct telephone any time—day or night.
>
> .     .     .     .     .
>
> Please do not hesitate to use the special phone as often as you wish. *IT IS FOR YOU TO USE.*

The Board found that the establishment of this Hot Line was "the most significant single violation of the Act." Relying on the rule established in *Teledyne Dental Products Corp.*, 210 N.L.R.B. 435 (1974), the Board held that the creation of the Hot Line was coercive conduct violating section 8(a)(1) because it was conduct "designed to convince the employees that their demands will be met through direct dealing with [the employer] and that union representation could in no way be advantageous to them." *Id.* at 435. In *Teledyne* the employer, after refusing to recognize a Union with a card

---

**8.** For example, in a letter to the employees dated June 27, just two days prior to the election, the Company listed the numerous benefits already enjoyed by the employees and stated, "We are proud our wages and benefits and conditions are better than those of other companies in the screw machine industry  .   .   . and we expect to do *even better in the future.*" Second, in a leaflet replying to two Union leaflets, Rudolph Koppel stated that only the Company could protect the employees' steady jobs and, after stating that he was confident that the employees would vote No, stated: "And Nobody Will Regret It." Third, in the Open Letter of June 28, the day before the election, the Management reiterated the job security theme and stated "your company *will* strive for continued improvements." In addition, the management distributed copies of two employees' letters, one of which echoed the job security and management power to deliver theme. The other stated in part "Harry and his father have alluded to improvements in the future if they are given the chance."

majority, had his secretary solicit a list of employee grievances. Thereafter, he agreed to accede to all of their demands and they informed the Union that they no longer cared to be represented. The Board found that this solicitation of grievances was a violation of section 8(a)(1) of the Act and issued a bargaining order. *Id.* at 435–36. It is firmly established that an employer violates section 8(a)(1) by his solicitation of grievances, if accompanied by an express or implied promise to remedy the grievance if the union is rejected in the election. *See Hedstrom Co. v. NLRB*, 558 F.2d 1137, 1142 (3d Cir. 1977) (plant manager encouraged employees to file grievances with him and suggested they would be remedied); *Landis Tool Co. v. NLRB*, 460 F.2d 23, 24–25 (3d Cir.) (calling in employees and asking what their complaints or gripes were), *cert. denied*, 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972).

There is substantial evidence in the record as a whole that the Hot Line was created in order to encourage employees to present their grievances to the Koppels, and that the distribution of copies of the questions and answers was an implied promise that the grievances would be remedied. Given our deferential *Armcor* standard of review, we cannot disregard the finding of the Board that the creation of the Hot Line was intended and understood to be a solicitation of grievances and an implied promise that those grievances would be remedied and therefore violated section 8(a)(1).

### E. *Promises of Benefits: Promised Wage Increases*

The Administrative Law Judge also found that one of the Company's supervisors had promised wage increases to two employees should the Union be defeated in the election. The testimony of Dorothy Dickhut, a member of the organizing committee, was that her machine and Erika Bordos' machine were back-to-back, so that the two women faced each other while working. She claimed that there was a passageway between the two machines and that at the relevant time she was in that space cleaning her machine. She stated that although she could not remember the exact words, she overheard Joe Weresow, a supervisor, promise Erika Bordos a twenty-cent raise if the Union was defeated. Veronica Taratko, also on the organizing committee, testified that Weresow made the promise of a twenty-cent raise separately to Bordos and Sarolta Gruber, both of whom reported the offers to her. Erika Bordos was not called to testify. Sarolta Gruber's brief testimony was that a week before the election Weresow told her that if the Union lost the election, the Company might grant a wage increase, but that Weresow could not promise anything "because it's not his money." She stated, however, that she could not remember the exact words or where she was at the time and she admitted that she had trouble understanding English.

Weresow's testimony is somewhat different. He testified that in the week before the election he encountered Bordos and Gruber having lunch. He said that they asked him about the promises that the Union was making, and that he told them that the Union could not promise any more than he could because the wages were neither his nor the Union's to promise. He testified further that he reminded them that they had received twenty-cent raises in the past and that union dues would eat away at those increases in the future.

Although the Company argued that no promises were made, a future wage increase was certainly implied in Weresow's statement. Given our deferential standard of review, we must accept the finding of the Board that a promise of a wage increase, either express or implied, was made to two employees. The record also contains substantial evidence that the purpose was to impinge on these employees' free choice and therefore under *Exchange Parts* the promises, whether express or implied, were prohibited by section 8(a)(1). We affirm the findings that the promises were made and that they were violations of section 8(a)(1).

### F. *Promises of Benefits: The Great Adventure Outing*

On June 24, 1977, the management invited all employees and their families to an

outing at Great Adventure on June 26, for which the Company paid the admission fees and provided free lunches. The Management described this as the first outing in what was planned to be an annual event.

Whether or not the Company intended to create a conflict with a Union-sponsored rally held on the same day and whether or not the plans for the outing were made prior to the advent of the organizing campaign, the outing was a conferral of a benefit and an explicit promise of a future benefit, both violations of section 8(a)(1). Substantial evidence supports the Board's findings that the outing occurred, that the future outings were promised, and that these were benefits with the intended effect of influencing votes in violation of section 8(a)(1).

### III.

On November 17, 1977, after the Union had lost the election and after the Board's complaint against Garry had issued, the Company posted a notice informing the employees that an agent of the Board had been questioning employees. The notice also stated that the agent was preparing for the hearing to be held in December and was assisting in preparing the Union's case. The notice then stated:

> We want you to know that you are not obligated to talk to the agent or sign anything. If you do sign something, they may attempt to use this to bolster the union's claim that they represent a majority of our employees on a given date, and that Garry should *now* be directed— without any election—to recognize District 65 as your bargaining agent.

> .  .  .  .  .  .

> The N.L.R.B. agent is not interested in the results of the prior vote . . . or that you may not want District 65 to represent you now. He only wants your signature in order to force Garry to recognize District 65 as your bargaining agent. Again, you are not obligated to talk to the agent or sign anything.

On November 30, 1977, in response to an unfair labor practice charge, the Company

distributed another letter stating that employees were free to talk to the agent and that technically the agent was only assisting a Board attorney who would be presenting the case, and would not actually be working for the Union.

The Board found that the November 17 letter constituted interference with the investigation which was a "clear violation of Section 8(a)(1)." The Board relied on this holding to support its bargaining order, commenting that such behavior made a free and fair election in the future "an extremely remote possibility." 242 N.L.R.B. No. 94, slip op. at 4.

In *Florida Steel Corp. v. NLRB*, 587 F.2d 735 (5th Cir. 1979), the Company, after winning the election and during the subsequent Board investigation of unfair labor practice charges, distributed a letter advising the employees that they had a right to consult with counsel prior to talking with the agent and that the Company would recommend an attorney to any employee who so desired. The Fifth Circuit held that the letter was not coercive and contained no threat of reprisal, and referred to the Board's contrary conclusion as "pure speculation and imagination." *Id.* at 750–51. Moreover, the letter was accurate and objective and did not discourage employees in any way from cooperating with the Board. *Id.* at 752–53.

Similarly, the letter distributed in this case did not tend to coerce the employees. It informed them of a right not to talk with the agent and made reasonably clear the agent's role. Moreover, to the extent that it might have been coercive, the November 30, 1977 letter cured that defect in sufficient time for any employee to talk with the agent or the Board if he or she so chose. There is no substantial evidence supporting the Board's finding that the letter violated section 8(a)(1) because there is no reasonable likelihood that it was coercive. We therefore reverse this finding of a violation.

### IV.

The Administrative Law Judge also found that the Company had engaged in

several instances of discriminatory conduct aimed at union activists in violation of section 8(a)(3). In reviewing this decision, the Board stated:

> We view with particular significance Respondent's unlawful punishment of active union supporters by the imposition of more stringent disciplinary procedures[.]

242 N.L.R.B. No. 94, slip op. at 3. The evidence in the record reveals three written warnings that were issued to two members of the Union organizing committee. Dorothy Dickhut and Veronica Taratko were given written warnings for being absent and failing to call in, and Taratko and her mechanic were given written warnings for producing unacceptable parts for two days. Moreover, an oral warning was given to Dickhut concerning abuse of bathroom breaks.

We held in *Armcor* that the critical element in reviewing a section 8(a)(3) violation

> is the intent of the employer to discourage union activity. . . . When the record establishes a prima facie case that "the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives."

*NLRB v. Armcor Indus., Inc.*, 535 F.2d at 243, *quoting NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967) (emphasis in original). More recently, we reiterated that the test is the motive of the employer, and we held that in spite of a concurrent permissible justification, "the action is an unfair labor practice if it is partly motivated by reaction to the employee's protected activity." *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978).

Although the record is clear that Taratko and Dickhut knowingly violated company rules by being absent without calling in, it is also clear that, except for Sannwaldt, the mechanic, only union activists received written rather than oral reprimands. The normal policy was to reprimand orally first, but only with respect to Dickhut's absence

without calling in is there any evidence that that policy was followed. Taratko had no history of oral warnings for absence or for bad part production. Although there is testimony that several other employees had begun to complain to Weresow about Taratko and Dickhut and their increasingly frequent meetings in the ladies' room, there is certainly substantial evidence that the decision to give written warnings was at least "partly motivated by reaction to the employee's protected activity." *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d at 368. There is testimony, for example, of three conversations between Weresow and the members of the Union organizing committee in which Weresow made anti-union remarks. Moreover, it is undisputed that the decision to issue written reprimands was his alone. In the context of the election campaign, however, he should have orally warned both that further infractions would result in written reprimands rather than, as he did, simply tightening up the disciplinary procedures. There is substantial evidence to support the finding that Weresow's motive was at least partly anti-union animus and therefore the section 8(a)(3) finding cannot be disregarded.

### V.

We turn now to the final issue presented by the petition, and consider whether those violations of section 8(a)(1) and section 8(a)(3) as to which there is substantial evidence in the record are sufficient to support the bargaining order issued by the Board. As we recognized in *NLRB v. Daybreak Lodge Nursing & Convalescent Home*, 585 F.2d 79 (3d Cir. 1978), two types of bargaining orders were contemplated by the Supreme Court when it decided *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We described the categories as

> Exceptional cases marked by outrageous and pervasive unfair labor practices of such a nature that they cannot be eliminated by traditional methods, and thus a fair and reliable election cannot be held: and

■ Cases marked by less pervasive practices which nonetheless still have a tendency to undermine majority strength and impede the election process, and in which additionally there is a showing that the union at one point had a majority. In this category the Board must find that the possibility of insuring a fair election is slight and employee sentiment once expressed through cards would on balance be better protected by a bargaining order.

585 F.2d at 82; see *NLRB v. Gissel Packing Co.*, 395 U.S. at 613–15, 89 S.Ct. at 1939–1940.

In the instant case, the Board issued its bargaining order under the rule set forth in category 2. The Board found, and the record fully supports, that at one time the Union had obtained cards from a majority of the employees in the unit and that the unfair labor practices committed by the employer eroded that majority and so impeded the election process that the possibility of a fair election in the future was extremely remote. For the purposes of this conclusion, the Board found that the most significant violation was the solicitation of grievances through the creation of the Garry Hot Line. Also particularly significant to the Board's decision was the violation of section 8(a)(3) by more stringent application of disciplinary rules to union adherents.

These statutory violations found by the Board and supported by substantial evidence are sufficient to support the bargaining order. This case is unlike *Armcor*, where the Board failed to make or adopt specific findings of fact with regard to the coercive effect of various unfair labor practices, largely consisting of veiled threats and vague promises. Moreover, in *Armcor*, discharges of two union activists were insufficient to support the order because both were poor workers and the discharges probably did not threaten any other employees. *NLRB v. Armcor Indus., Inc.*, 535 F.2d 239, 245 (3d Cir. 1976). *But see id.* at 246 (Gibbons, J., dissenting in part) (would find Board's statement of reasons adequate and those unfair labor practices committed coer-

cive). Rather, in this case, leaflets and speeches threatened adverse consequences not based wholly on objective facts, see *NLRB v. Gissel Packing Co.*, 395 U.S. at 618, 89 S.Ct. at 1942, and promised or granted benefits in exchange for the Union's defeat. Moreover, the application of stricter discipline, although the motive was at least partially justifiable, was also partly motivated by the supervisor's reaction to protected activity. And insofar as it was aimed at Taratko, the reprimand involved an admittedly excellent worker who turned out bad parts because her mechanic had failed to change the cutting blade on her machine. Unlike *Armcor*, this sudden strictness could have been coercive.

In view of the numerous statutory violations that are supported by substantial evidence in the record, and in light of the proof that the Union at one time had an absolute card majority which was eroded during the course of the campaign, the Board properly issued the order to bargain. We therefore affirm all of the Board's findings with the exception of the finding that the employer obstructed the Board's investigation. The petition for enforcement will be granted.

WEIS, Circuit Judge, dissenting.

Once again, the Board relies upon *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), as its authority to issue a bargaining order, while ignoring the Court's admonition that secret elections are the preferred method of ascertaining whether a union has majority support. *Id.* at 602, 89 S.Ct. at 1934. If, by unfair labor practices, the election process has become tainted, then remedial steps must be taken. But a rerun election is the most satisfactory alternative since it preserves the employees' right to express their views in what obviously constitutes a matter of serious, personal concern.

Before the rerun election process may be bypassed, *Gissel* requires the Board to consider "the extensiveness of the employer's unfair labor practices in terms of their past effect on election conditions and the likeli-

hood of their recurrence in the future." *Id.* at 614, 89 S.Ct. at 1940. Only if the possibility of erasing the effects of past practices and ensuring a fair rerun election is, on balance, slight, may the Board issue a bargaining order. *Id.*

Here, the Board held that an order was necessary to "effectuate ascertainable employee free choice" because of the employer's pervasive anti-union campaign. It found that the most "significant single violation of the Act, for purposes of imposing a bargaining order" was the creation of the Garry Hotline. In addition, the Board relied heavily upon the alleged effect of the asserted interference with the Board's post-election investigation, saying, "for this reason, respondent's conduct makes the holding of a free and fair election in the future an extremely remote possibility."

The majority, however, has held, and I agree, that the company's postelection conduct was not an unfair labor practice. Therefore, there is no substance to the reason the Board cited as support for its belief that there could not be fair elections in the future. Moreover, as shall be demonstrated, the creation of the Hotline is insufficient justification for disenfranchising the employees.

As the majority explains, the Hotline was set up during Rudolph Koppel's hospital stay. Employees called a designated phone number and their questions were recorded; written answers were then made available to the employees in the plant. Eight questions and answers were processed during the existence of the Hotline. The Board concluded that the bulletin containing only the questions and answers "conveyed a clear promise of improved benefits should the union be defeated." The document does not support that characterization.

One caller asked why the company had not provided certain benefits, including better hospitalization and retirement plans. Part of the reply stated:

> "Our past record speaks for itself. We have regularly improved all benefits *without* a union. We are comparing our

benefits with our competitors, as well as with union contracts and we compare very well. I will see that you get specific information so you can see for yourself. (For example, for almost a year we have been studying various proposals and getting bids from several companies regarding significant improvements in our retirement plan)."

Another question submitted was, "If the union does not come in, are we still going to get Blue Cross and Blue Shield and free glasses and the dental care?" Koppel replied that the company intended to stay with its existing medical insurance program, and added:

> "Unfortunately, during an organization drive, I am prohibited from discussing any plans we have for adding optical coverage or improving coverage for dental care or about any other changes in our overall benefit plan.

> After you vote *NO* union on January 29, I can speak freely. If you are not satisfied with our actions during the next year, you have the alternative to election to join a union."

The responses accurately recited the limitations on the employer's ability to discuss future plans during the campaign and did not contain any clear promise of benefits. In fact, the answers closely resemble those at issue in an earlier Board decision, *Shop-Rite Development Co.*, 215 N.L.R.B. 777 (1974). In that case, the employer posted a notice entitled "Haslett Shop-Rite Hot Line" containing an employee question and the company's response.

> "QUESTION: Could you tell us again when the company could legally increase our wages and benefits if the Union is voted down again, and the same if the Union wins?

> ANSWER: If the employees vote against the Union again, and if the Union did not file charges again within 5 calendar days, we could increase wages and benefits as soon as the NLRB certifies the results of the election . . . .

Remember, because the . . . Union has been trying to organize our store, I have not legally been able to grant a general increase in wages and benefits. . . . I personally don't think this is fair to our employees, and I will be glad to get this settled so that some action can be taken."

The Board found that the employer's statements, viewed "within the context in which they were made," were protected by 29 U.S.C. § 158(c)[1] and thus "did not constitute objectionable conduct warranting setting aside the election." *Id.* at 778.

In this case, however, the Board does not cite *Shop-Rite* but relies instead on *Teledyne Dental Products Corp.*, 210 N.L.R.B. 435 (1974), where a bargaining order was issued after the employer solicited grievances, agreed to accede to all of the employees' demands, and actually made some concessions during the campaign. That is a quite different and more egregious scenario from the one presented here.

It may be in this case that the company intended the employees to infer a promise from the language of the memorandum and perhaps the Board's characterization of this as an unfair labor practice could be sustained.[2] But the question is a close one, and only emphasizes that if the matter can be considered an unfair labor practice at all, it cannot fairly be characterized as serious and pervasive. *See NLRB v. Gissel Packing Co., supra* at 614, 89 S.Ct. at 1940; *Teledyne Dental Products Corp., supra* at 435. The finding here that the Hotline memorandum constituted an unfair labor practice is a far cry from establishing that it so polluted the election environment that a fair rerun could not be had.

The extravagance of the Board's interpretation is apparent when the Hotline memorandum is considered in context. Leaflets analyzing wages and benefits were issued by both company and union, almost on a daily basis. Most of the flyers bombarded the employees with detailed descriptions of the company and union medical and retirement plans, as well as comparisons of wage rates paid by neighboring employers. Amidst the charges and countercharges in the almost incessant barrage of propaganda fired by both sides, to credit the isolated answers in the Hotline memorandum as so significant as to require a bargaining order borders on the ludicrous. As the Board and this court recognized in *Landis Tool Co. v. NLRB*, 460 F.2d 23 (3d Cir.), *cert. denied*, 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972), traditional remedies such as cease and desist orders coupled with a rerun election are adequate to correct an unfair labor practice of this nature. In short, the issuance of a bargaining order under these circumstances is not warranted; resort to that remedy should be had only when the degree of the unfair labor practice is severe enough to impede future elections.

In its other findings of unfair labor practices, the Board referred to the imposition of "more stringent disciplinary procedures" on active union supporters. Adopting the ALJ's conclusion that these workers were "singled out because of their union activities," the Board disregarded uncontradicted, documentary evidence that similar warnings were given both during and after the campaigning to other employees who were not active in the organization drive. It was beyond dispute that, in each instance, a violation of company rules had occurred.

---

**1.** 29 U.S.C. § 158(c) provides:

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or promise of benefit."

**2.** It is questionable that the Board is more competent than we to review documentary evidence, *cf. Mon River Towing, Inc. v. NLRB*, 421 F.2d 1 (3d Cir. 1969) (oral statement found to imply a threat). In any event, if the decision is not supported by substantial evidence on the record as a whole, including evidence opposed to the Board's view, we must set it aside. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488–90, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951).

The only issue was whether the reprimands should have been given orally or in writing.

The majority cites *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d 363, 368 (3d Cir. 1978), for the proposition that if the choice of disciplinary methods is "partly motivated by reaction to the employee's protected activity," it is an unfair labor practice. That quotation, however, failed to include the next sentence: "On the other hand, if the employee would have been fired for cause irrespective of the employer's attitude toward the union, the real reason for the discharge is nondiscriminatory." *Id.* Partial motivation is not enough; the Board must find that the permissible reason offered by the employer was merely a pretext, and the real motive was anti-union animus. *Gould, Inc. v. NLRB*, 612 F.2d 728, 734 (3d Cir. 1979). *See also Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595 (1st Cir. 1979). The Board made no such finding in this case. Furthermore, there is not substantial evidence that the issuance of the few written reprimands would have had any enduring effect on future elections.

Finally, the Board ignored a significant postelection development. Neither the ALJ nor the Board discussed a petition signed by 84 of the employees requesting that the election results stand as counted. This petition originated with one of the employees, was circulated throughout the plant, and was mailed to the Board. The refusal to even acknowledge its existence in the decision of either the ALJ or the Board is some indication of the Board's disregard of the wishes of the workers themselves. *See Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 990 (Weis, J., dissenting). Even though it stated in the beginning of its opinion that the primary purpose of the National Labor Relations Act is "to effectuate ascertainable free choice," the Board ignored a clear ex-pression of that choice in its excessive preoccupation with deterrence.

That the deterrence motivation may have resulted in a distortion of the proper remedy is suggested by another postelection development. Respondent's brief alleges that in August 1979, four months after the Board filed its decision, the Garry Company was sold to Akzona, Inc.[3] and that Rudolph and Harry Koppel are no longer employed by the company. The activities of these two men provoked most of the Board's criticism and fueled the drive for deterrence. If, in fact, the Koppels are no longer active in the company, the bargaining order loses its raison d'etre. Because I would, for the several reasons discussed above, deny enforcement of the bargaining order, the Board would be free on remand to evaluate this change in circumstances. *Hedstrom Co. v. NLRB*, 558 F.2d 1137 (3d Cir. 1977); *cf. NLRB v. Kostilnik*, 405 F.2d 733 (3d Cir. 1969) (alleged change of ownership alone is not of itself grounds for denial of enforcement).

In *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144, 151 (3d Cir. 1979), we said, "[w]e would be remiss in our judicial functions if, on a record as sparse as this one, we were to enforce a bargaining order which, on every count, cannot even be regarded as colorably in compliance with *Gissel*." Because that evaluation applies equally to the case at hand, I dissent from the enforcement of the bargaining order.

---

**3.** Respondent describes Akzona, Inc. as having "thirty-six [domestic] production facilities. The employees in twenty-six of those facilities are represented under collective bargaining agreements." Brief for Respondent at 46 n.41.